**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

-and-

Gerald C. Bender, Esq.
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

*Proposed Counsel to the Debtor and
Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Love Culture Inc.,[1] | Case No. 14-24508 (NLW) |
|           Debtor-in-Possession. | |

**DECLARATION OF J.E. RICK BUNKA, CHIEF RESTRUCTURING OFFICER
OF LOVE CULTURE INC., IN SUPPORT OF DEBTOR'S CHAPTER 11
<u>PETITION AND FIRST DAY MOTIONS</u>**

---

[1] The last four digits of the Debtor's federal tax identification number are 8782.

I, J.E. "Rick" Bunka, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Restructuring Officer of Love Culture Inc. ("<u>Love Culture</u>"), the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or the "<u>Company</u>").

2.      Prior to joining the Company, I served in various senior executive roles in all aspects of financial management.  My most recent position was the chief executive officer of Dots, a women's specialty retail apparel chain that operated 420 stores in 28 states and employed over 4,000 associates.  Prior to serving in this role, I served as president from 2006 to 2010 and chief financial officer from 1997 to 2006.  Prior to joining the Dots organization, from 1987 to 1996 I was employed by Gantos, a $200 million national woman's specialty retailer that operated 160 stores in 25 states.  While at Gantos, I performed various finance related functions, including serving as chief financial officer from 1993 to 1996 and controller from 1987 to 1993.  I earned a Masters of Business Administration, summa cum laude, from Michigan State University in 1985 and a Bachelors of Arts, cum laude, from Alma College in 1981.  I have been a member of the National Retail Federation, a leading retail industry professional organization, since 1987; for eleven of these years, I served as a member of the Chief Financial Officer Advisory Council.

3.      I submit this declaration (the "<u>Declaration</u>") pursuant to section B(3) of the *Guidelines Governing First Day Matters*, set forth in Appendix A to Rule 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "<u>Local Bankruptcy Rules</u>") in support of the voluntary petition for relief for the Debtor's case (the "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and the motions and applications for related relief filed as of the date hereof (the "<u>Petition Date</u>") or concurrently herewith (collectively, the "<u>First Day Pleadings</u>").  I am authorized to submit this Declaration in accordance with the relevant

resolution of the Company's Board of Directors filed simultaneously herewith.  If called upon, I would testify competently to the facts set forth herein.

4.      In my capacity as Chief Restructuring Officer for the Debtor, I am responsible for the general oversight of the Debtor's business and financial affairs. Consequently, I have gained detailed knowledge of the Debtor's finances and operations.

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtor's professional advisors, including Lowenstein Sandler LLP ("Lowenstein Sandler") and PricewaterhouseCoopers LLC ("PwC"), and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtor's financial records and the retail industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

6.      I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtor's business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtor's estate.  I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of its estate, creditors, and other stakeholders.

## PRELIMINARY STATEMENT

7.       Founded in 2007, the Company is a lifestyle brand and shopping destination for fashion-forward women who are "hip, trendy, stylish & always fun."  The Company seeks to empower women with affordable - yet stylish - accessories and clothing ranging in sizes 1/2 through 17/18.  In 2010, the Company introduced an e-commerce site which dramatically increased the geographical diversity of its customer base and expanded its brand name nationwide.  In 2012, after identifying an opening in its market, the Company introduced a new line to its offerings, Boutique Culture.  This fashion line caters to customers looking for upscale - yet signature - "Love Culture" apparel.

8.       Beginning in the first quarter of 2012 and continuing until the present, the Company experienced a series of financial difficulties resulting from over-expansion and rapid store growth which, in turn, led to poor performance, despite topline growth and continued extension of the brand and to loss of key personnel.  These difficulties were compounded by ongoing liquidity problems that disrupted consistent and meaningful delivery of timely "fashion right" product to the Debtor's retail stores.

9.       It is my understanding that prior to the Petition Date, the Company engaged in a series of restructuring efforts, including efforts to obtain a strategic partner to invest in the organization or to sell the Company to a third party.

10.       The reasons necessitating this filing are two-fold.  *First*, the Company faces liquidity issues.  *Second*, a significant portion of the Company's recently opened stores are significantly underperforming which has resulted in current and ongoing operating losses from expensive regional mall-based operating leases.  Given the Company's liquidity issues, the Company decided to file the Chapter 11 Case, with the consent of its prepetition lender, in order

to gain access to necessary operating liquidity and maximize its value by closing and rejecting unprofitable store leases and to allow the Company to focus its resources on its most profitable operations.

11.     To enable the Debtor to operate effectively and to minimize any potential adverse effects of this filing, the Debtor requests various types of relief in the First Day Pleadings including, to: (a) continue the Debtor's normal day-to-day operations while operating in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies, including customers, employees, suppliers and creditors; (c) establish procedures for the smooth and efficient administration of this Chapter 11 Case; and (d) to conduct an auction and sale process for the Company.

12.     To familiarize the Court with the Company's business and the first day relief sought by the Debtor, this Declaration is organized into three sections.  **Part I** provides background information with respect to the Debtor's business operations and corporate history, as well as a summary of the Company's pre-petition capital structure.  **Part II** describes the circumstances leading to the commencement of this Chapter 11 Case.  **Part III** summarizes the relief requested in and the facts supporting each of the First Day Pleadings.

## I. BACKGROUND

**A.     Overview of Love Culture's Business**

13.     The Debtor is a leading specialty retailer in the fast fashion segment and brand of edgy, fashion-forward apparel and accessories catering to young women in the 18-35 demographic.

14.     The Company was first established in 2007 as a Delaware limited liability company.  It was then converted to Love Culture Inc., a registered California corporation, on

October 26, 2009.  The Company has begun to reach global recognition as a competitive brand in young women's fashion, with two franchised locations in the Middle East and East Asia.  It is regularly featured in various social media platforms and traditional media outlets for its fashion forward and on-trend offerings at affordable prices.

15.    The Company leases commercial retail space in shopping malls and outlet centers in twenty-seven states.  Love Culture operates four stores in New Jersey at the following shopping malls: (i) Willowbrook Mall, (ii) Bridgewater Commons, (iii) Garden State Plaza and (iv) Woodbridge Center.  The Debtor also has operations located in Saudi Arabia and the Philippines pursuant to two franchise agreements.

16.    Additionally, the Debtor maintains a website, www.loveculture.com, and promotes its brand through various social media platforms, such as Twitter and Facebook.

17.    As of the Petition Date, the Debtor employs approximately 1,515 employees ("Employees") throughout their retail locations, corporate headquarters and distribution centers, none of whom are subject to a collective bargaining agreement.  Of these Employees, approximately 169 are employed full-time and approximately 1,346 are employed part-time. The Debtor's aggregate bi-weekly payroll is approximately $842,000.  However, the 20 Employees working at the Debtor's store located in Providence, Rhode Island are paid weekly.  The gross weekly payroll for these Employees is $5,000.  All Employee payrolls are issued on Friday.

18.    To supplement its workforce, the Debtor utilizes the services of eleven independent contractors ("Independent Contractors").  The Independent Contractors mainly assist the Debtor with its marketing and branding efforts.

B.      **Debtor's Prepetition Debt Structure**

(i)      **Prepetition Secured Obligations.**

19.      As of the Petition Date, the Debtor has outstanding secured debt owed to
Salus Capital Partners, LLC ("Salus" or the "Prepetition Secured Lender"), consisting of (i) a
revolving component in the original principal amount of up to $17.5 million (the "Revolving
Facility"), and (ii) a term loan facility in the original principal amount of $3.5 million ("Term
Facility").  In February 2014, the Term Facility was increased to $6 million.  As of the Petition
Date, approximately $13,667,972 remains outstanding under the Revolving Facility and the
Term Facility (collectively, together with any amounts incurred or accrued, but unpaid prior to
the Petition Date, the "Prepetition Secured Obligations").  To secure the Prepetition Secured
Obligations, except for certain permitted encumbrances (the "Permitted Liens"), the Debtor
granted the Prepetition Secured Lender first priority security interests in, and liens on,
substantially all its property (collectively, the "Prepetition Collateral").  The Company's
obligations under the Prepetition Secured Obligations are further secured by a limited personal
guaranty provided by Jai Rhee.

(ii)      **Recently Filed UCC-1 Statements; Contested Liens.**

20.      Prime Business Credit, Inc. ("PBC") asserts that it is a secured creditor
and that it maintains a security interest in and lien on substantially all of the Debtor's assets by
virtue of a UCC-1 financing statement filed on June 11, 2014 in connection with certain pre-
petition financings.  The Debtor disputes PBC's claims and liens.

21.      In addition, United LC Capital, LLC ("United") filed a UCC-1 financing
statement against substantially all of the Debtor's assets on April 20, 2014.  The Debtor has no

documentation supporting any claims by United and disputes validity of any such claims and liens.

22.    The Debtor contests any liens asserted by PBC or United (the "Contested Liens").

**(iii)    Trade Debt.**

23.    As of the Petition Date, the Debtor has aggregate unsecured debts totaling approximately $23 million, which include amounts owed for merchandise, utilities, rents, professional fees, and employee-related expenses. Of that amount, approximately $20 million constitutes trade vendor payables.

## II. EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE

24.    Beginning in the first quarter of 2012, Love Culture experienced financial difficulties from over-expansion and rapid store growth which led to poor performance, despite topline growth and continued expansion of the brand. A series of large capital investments to update its informational systems and re-launch the e-commerce website, made by new management team members, further contributed to liquidity issues and capital constraints and thus financial underperformance.

25.    In 2013, the Company's chief financial officer left the Company and another member of the Love Culture team was promoted to this position. The Company refocused its efforts to improve liquidity. *First*, the Company refinanced its debt to complement its growth trajectory, increasing available liquidity by approximately ten million dollars, which was provided under the new senior secured revolving and term loan facility with Salus. *Second*, the Company hired a third party expert to address approximately forty underperforming stores in its lease portfolio, by reducing large-format lease spaces to smaller, more profitable spaces,

relocating stores to high-traffic areas, and terminating leases of the least profitable stores, all of which resulted in an aggregate cash savings of approximately eight million dollars. *Third*, the Company hired new, highly-experienced merchandising personnel to establish guideposts for brand positioning, pricing, and product merchandising.

26.     In late 2013, the Company also hired a private equity consultant to raise new capital or, alternatively, locate a buyer. During this process, the Company approached a selected group of potential acquirers with the opportunity to invest in, or acquire, the Company and its assets. Fourteen interested parties entered into non-disclosure agreements with the Company. Of this group, five were provided with due diligence materials. Ultimately, two bids were submitted to purchase the Company. However, in the opinion of the Company's Board of Directors, none of the potential acquirers submitted adequate bids to acquire or invest in the Company.

27.     While the Company's turnaround strategy has begun to demonstrate growth on an individual store basis, sales overall remain below projections. Beginning in approximately April 2014, certain of the Company's vendors and factors contracted credit terms and/or began demanding that it pay for goods on a significantly shortened timeframe or upon delivery. In fact, certain creditors received payment premised on the release of new goods, then failed to deliver the new goods. These repeated occurrences caused the Company to suffer from significant liquidity challenges.

28.     In June 2014, the Company retained Point North LLC and appointed me as Chief Restructuring Officer to guide the Company through a restructuring process. The Company also retained PwC and Lowenstein Sandler to assist it in evaluating strategic

alternatives and engaged Consensus Security Services LLC and Advisory Services LLC ("Consensus") to initiate a broader marketing campaign in an effort to sell the Company's assets.

29.     Prior to the Petition Date, Consensus began marketing the Company to both strategic and financial purchasers.  As of the Petition Date, approximately 154 parties were contacted and from this group, 37 non-disclosure agreements were executed.  Consensus has been in discussions with multiple parties and, as a result, to date, four letters of intent have been received.  In addition, Consensus scheduled several meetings for interested purchasers to review the Company's facilities and store locations.

30.     Gaining and maintaining the support of the Debtor's employees and other key constituencies, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be crucial to the success of the Debtor's efforts in this Chapter 11 Case, which will include continuing to market the Debtor's assets for sale in a court-approved auction and sale process.

## III. FIRST DAY RELIEF REQUESTED

### A.     Goals of the Chapter 11 Case

31.     The Company seeks to gain access to necessary operating liquidity to enable it to swiftly and effectively move toward a sale of some or all its store locations while minimizing administrative expenses.  Through this bankruptcy proceeding, the Debtor intends to continue the restructuring process that it began in late 2013.  Primarily, the Debtor and its advisors believe that the chapter 11 process will create the opportunity to "right-size" the Company's store footprint through lease rejections, a process which is intended to enable the Company to emerge from the Chapter 11 Case financially stable company, albeit under new ownership.

32.    The Debtor requires additional liquidity as a bridge to a sale or other restructuring initiative. In order to reach that goal, the Debtor requires certain post-petition debtor-in-possession financing (the "DIP Financing").  Pursuant to the Debtor's motion seeking approval of proposed DIP Financing and authority to use cash collateral, filed concurrently herewith, the Debtor is seeking approval to enter into a $12 million DIP Financing Facility with Salus.  The DIP Financing Facility will enable the Company to maximize the value of its business and properties for all stakeholders.

33.    The Debtor has determined that certain of its leased stores are underperforming due to either the store's location and/or the competitive landscape, or because such store is currently subject to an unfavorable lease term.  These leases include above-market rent or restrictions that limit the Debtor's flexibility to adjust its lease portfolio as the market changes.  The Debtor intends to use the tools available in chapter 11 to reject leases that are burdensome to its estate and/or secure meaningful economic concessions from landlords to rationalize their lease portfolio.

**B.**    **Relief Sought In the First Day Pleadings**

34.    It is critical for the Debtor to maintain the loyalty and goodwill of, among other constituencies, its vendors, employees, and customers.  To that end, the Debtor has filed the First Day Pleadings seeking relief intended to allow the Debtor to effectively transition into chapter 11 and minimize disruption to the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate.  Unless this "first day" relief is granted, I believe the Debtor's business operations will suffer significant adverse, immediate, and irreparable consequences.

35.    Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I am told by the Company's advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtor narrowly tailored its requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

**C.    Administrative Motions**

> **(i)    Application For Expedited Consideration Of First Day Matters (the "Expedited First Day Application")**

36.    The Debtor requests entry of an order designating its First Day Pleadings as requiring expedited consideration before this Court.  I believe that the relief requested in the Expedited First Day Application is essential to avoid the potentially disruptive impact the commencement of the Chapter 11 Case might have on the Debtor and will facilitate the Debtor's orderly transition into Chapter 11 and increase the value of the Debtor's assets.  Accordingly, on behalf of the Debtor, I respectfully submit that the Expedited First Day Application be approved.

> **(ii)    Debtor' Application for Entry of an Order Authorizing the Retention of Epiq, Inc. as Claims and Noticing Agent Effective as of the Petition Date (the "Epiq Application")**

37.    Pursuant to the Epiq Application, the Debtor seeks to retain Epiq, Inc. ("Epiq") as claims and noticing agent in the Chapter 11 Case.  I believe that by retaining Epiq, the Debtor's estate, and particularly its creditors, will benefit from Epiq's services.  Epiq

specializes in noticing, claims processing, and other administrative tasks necessary to operate a chapter 11 case effectively.  It is my understanding that Epiq is fully equipped to manage claims issues and provide notice to creditors and other interested parties in the Chapter 11 Case. Therefore, on behalf of the Debtor, I respectfully submit that the Epiq Application be approved.

(iii)    **Debtor's Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedules and Statements Motion")**

38.    The Debtor requests entry of an order granting a 30-day extension of the time to file its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and Statements") for a total of 45 days after the Petition Date without prejudice to seek a further extension.  The Debtor has thousands of potential creditors, and the breadth of the Debtor's business operations require the Debtor to maintain voluminous books and records, and complex accounting systems.  Given the size, complexity, and geographic scope of the Debtor's operations, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the hundreds of employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtor during the first fourteen days following the Petition Date.  The Debtor is sensitive to the need to complete the Schedules and Statements as soon as possible, and it intends to complete the Schedules and Statements before the proposed extended deadline, if possible.

39.    I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtor's estate, creditors, and all parties-in-interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on

behalf of the Debtor, I respectfully submit that the Schedules and Statements Motion should be granted.

**D.      Operational Motions**

40.      The Debtor intends to ask for relief with respect to the following First Day Pleadings that directly impact the Debtor's ability to operate its business and manage its properties as a going concern.

> **(i)      Debtor's Motion For Entry of Interim And Final Orders (I) Authorizing the Debtor to Obtain Post-petition Financing on a Senior Secured And Superpriority Basis; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Scheduling Final Hearing Thereon; and (V) Granting Related Relief (the "Financing Motion")**

41.      Subject to Court approval, the Debtor has negotiated and reached an agreement to enter into the DIP Financing Facility that consists of a senior secured, superpriority post-petition credit facility consisting of a revolving loan in the maximum principal amount of $12 million (the "DIP Revolving Loan"). Upon entry of the order approving the DIP Financing Facility on a final basis, a portion of the Debtor's existing obligations under the Prepetition Credit Agreement will be partially rolled-up and replaced by the DIP Financing Facility.

42.      In the ordinary course of business, the Debtor uses cash on hand and cash flow from operations to fund working capital, inventory purchases, capital expenditures, and other general corporate purposes. An inability to use these funds during the Chapter 11 Case could cripple the Debtor's business operations. Indeed, the Debtor must use its cash to, among other things, continue operating its businesses in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operational needs - all of which are necessary to preserve and maintain the Debtor's

-14-

going concern value and, ultimately, maximize the value of its assets.  As set forth in more detail in the Financing Motion, access to the DIP Financing Facility and use of Salus' Cash Collateral (as defined in the Financing Motion) are critical to the Debtor's ability to continue to operate through an orderly sale process and to permit the Debtor to maximize value for the benefit of its stakeholders.  The Debtor determined that the DIP Financing Facility is the best financing option available to accomplish its goals.

43.     If the Financing Motion is granted, the DIP Financing Facility will provide the Debtor the liquidity it needs to continue to operate through the conclusion of a sale process pursuant to section 363 of the Bankruptcy Code.  The ability to operate will enable the Debtor to conduct a competitive bidding process for the sale of all or part of its assets and business, rather than a piecemeal liquidation of its assets and, therefore, will maximize value for the Debtor's estate.  Most significantly, the ability to pursue a sale of all or some of its stores will provide the Debtor with an opportunity to continue employment for many of its employees.  Moreover, the Debtor will honor gift cards and customer credits issued prior to the Petition Date for two-weeks. In short, approval of the DIP Financing Facility by the Court will permit the Debtor to continue to operate its business while minimizing the impact of filing this Chapter 11 Case will have on the Debtor's stakeholders.

44.     As set forth in the Financing Motion, the Debtor's execution of the DIP Financing Facility agreement is an exercise of its sound business judgment that warrants approval by the Court.  Prior to the Petition Date, with the assistance of its advisors, the Debtor undertook an analysis of its projected financing needs during the pendency of the Chapter 11 Case.  Based on such analysis, the Debtor determined that post-petition financing was necessary to support its operational and restructuring activities.  Accordingly, the Debtor began negotiating

with the Prepetition Secured Lender regarding the terms of a post-petition DIP Financing Facility.

45.     After a series of good faith, arms-length negotiations, the Debtor and the DIP Lender entered into the DIP Financing Credit Agreement (as defined in the Financing Motion), whereby the parties reached agreement on the material terms of the DIP Financing Facility.  The Debtor determined in its sound business judgment, and upon the advice of counsel and other professionals, that the DIP Financing Credit Agreement provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  Without post-petition financing, the Debtor would be unable to continue operations without interruption or pursue an orderly sale of its assets under section 363 of the Bankruptcy Code.

46.     Moreover, as noted, virtually all of the Debtor's assets are encumbered by pre-petition liens.  Thus, even if alternative debtor-in-possession financing was available on more favorable terms and conditions, and could be consummated in a timely fashion, such financing would result in a protracted priming contest with the Prepetition Secured Lender, the results of which could not be predicted with certainty.  Any protracted litigation would jeopardize the Chapter 11 Case from the outset.  Although the DIP Lender will be granted priming liens as set forth in the proposed DIP Orders (as defined in the Financing Motion), the DIP Lender will be priming itself.

47.     The Debtor's ability to finance its operations and the availability of sufficient working capital and liquidity are vital to preserving and maintaining the Debtor's going-concern value and maximizing the value of the Debtor's estate for the benefit of all creditors.  As discussed in detail in the Financing Motion, the Debtor requires immediate access to the Prepetition Secured Lender's Cash Collateral in order to meet its liquidity needs in

connection with the Chapter 11 Case.  While the Interim DIP Order (as defined in the Financing Motion) authorizes the Debtor to enter into a DIP Financing Credit Agreement, the Debtor submits that such relief is inseparable from the relief relating to the use of Cash Collateral.  The Prepetition Secured Lender is unwilling to consent to the Debtor's use of Cash Collateral absent the Debtor's entry into the DIP Financing Facility in its entirety.

48.    For the foregoing reasons, I believe that the terms and conditions of the DIP Financing Facility and the use of Cash Collateral are fair and reasonable, and have been negotiated in good faith and at arms-length.  The Debtor and its advisors have determined, in their reasonable business judgment, that the DIP Financing Facility is the best financing option available under the present circumstances.  I further believe that the relief requested in the Financing Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable to the Debtor to operate its business in chapter 11 without disruption.  On behalf of the Debtor, I respectfully submit that the Court should (a) approve immediate access to the DIP Financing Facility and use of Cash Collateral on an interim basis pursuant to the Interim DIP Order and (b) enter the Final DIP Order at the Final Hearing (as those terms are defined in the Financing Motion).

**(ii)    Debtor's Motion for an Order (I) Authorizing the Debtor to Continue and Maintain Its Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day Objection Period and (IV) Granting Related Relief (the "Cash Management Motion")**

49.    The Debtor requests entry of an order authorizing it to: (a) continue using its existing cash management system, bank accounts and business forms, (b) modifying the investment guidelines, (c) providing the U.S. Trustee with a 60-day objection period, and (d)

granting related relief.  In addition, the Debtor further requests that this Court authorize and direct the Debtor's Banks to (a) continue to maintain, service, and administer the Bank Accounts (as defined in the Cash Management Motion), and (b) debit the Bank Accounts in the ordinary course of business.

50.    In the ordinary course of its business, the Debtor utilizes an integrated, centralized cash management system to collect, transfer and disburse funds generated by its operations.  The Cash Management System (as defined in the Cash Management Motion) is specifically tailored to meet the Debtor's current operating needs, enabling the Debtor to centrally control and monitor corporate funds and available cash, as well as to keep accurate account balances and presentment information.

51.    If the Debtor is required to open separate accounts as debtor-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements.  In fact, the Debtor would need to open dozens of new bank accounts.  Thus, the Debtor's treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Case.  The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtor's cash flow.   Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtor's ability to operate its business while pursuing these arrangements. Additionally, the Debtor would be subject to significant administrative burdens and expenses because it would need to execute new signatory cards and

depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

52.    I believe the Debtor's continued use of the Cash Management System will greatly facilitate its transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls.  I believe that parties-in-interest will not be harmed by the Debtor's maintenance of the existing Cash Management System, including its Bank Accounts, because the Debtor has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, the Debtor and its advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers.  In light of such protective measures, the Debtor submits that maintaining the Cash Management System is in the best interests of its estate and creditors.

53.    Given the substantial economic scale and geographic reach of the Debtor's business operations, I believe that any disruption to the Cash Management System could impede a successful restructuring of the Debtor's business.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate and will enable the Debtor to operate its business in chapter 11 without disruption.  Therefore, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

> (iii)    **Debtor's Motion for an Order (I) Authorizing, But Not Directing, the Debtor To Pay Pre-Petition Wages, Salaries And Related Obligations and Taxes, and (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations (the "Wage Motion")**

54.     By the Wage Motion, the Debtor seeks entry of an order authorizing, but not directing, it to (a) pay all pre-petition claims of employees for wages, salaries, sick pay, personal day pay, vacation pay, holiday pay, and other accrued compensation; (b) make all payments for which employee payroll deductions were withheld pre-petition; (c) reimburse all pre-petition employee business expenses; (d) make pre-petition contributions and pay benefits under certain employee benefit plans; (e) honor workers' compensation programs; (f) pay other miscellaneous employee-related costs including, but not limited, to processing costs and fees; (g) continue employee programs with respect to vacation, sick, personal, and holiday leave; and (h) continue certain health, welfare, savings, and other benefit programs (collectively, the "Employee Obligations").

55.     In the ordinary course of business, the Debtor employs approximately 1,515 individuals (collectively, the "Employees") in its stores, distribution center, and corporate headquarters, including approximately 1,346 full-time employees and approximately 169 part-time employees, all of whom are paid in arrears.  The Debtor also utilizes the services of approximately eleven independent contractors (the "Independent Contractors"), who submit invoices for services provided.

56.     The Debtor seeks authority to pay accrued pre-petition Employee Obligations in the ordinary course of business in the following approximate amounts:

| Category | Accrued Pre-Petition Amount |
|---|---|
| Employee Wages and Salaries | $546,428 |
| Independent Contractors | $19,000 |
| Employee Payroll Deductions (Garnishments, Health Premiums, FSA Contributions, etc.) | $29,992.98 |
| Payroll Taxes and Tax Withholding | $166,118.56 |
| Health and Welfare Benefits | $162,000 |

| Category | Accrued Pre-Petition Amount |
|---|---|

57.     The continued, uninterrupted service of the Employees is essential to the Debtor's reorganization efforts.  I believe that the success of the Debtor's restructuring efforts is dependent upon the continued dedication, goodwill, and support of its Employees and Independent Contractors and the willingness of temporary agencies to continue to provide Temporary Employees.  I further believe that any delay in paying the Employee Obligations outstanding as of the Petition Date, a failure by the Debtor to continue its practices, programs, and policies with respect to Employee benefits, or a failure by the Debtor to pay the amounts due and owing to Independent Contractors could severely disrupt the Debtor's relationship with its workforce, impair morale at this critical juncture, and disrupt the Debtor's business operations. Absent payment of all accrued Employee Obligations and continuation of the Debtor's benefits programs, I believe that Employees may quickly seek alternative employment (including with the Debtor's competitors), which would hinder the Debtor's ability to serve its customers while simultaneously requiring the Debtor to incur the cost and distraction of seeking replacement Employees instead of focusing on its reorganization efforts.  I believe that the relief requested in the Wage Motion is in the best interests of the Debtor, its estate and creditors, and all other parties-in-interest in the Chapter 11 Case, and will enable the Debtor to continue to operate its business during the Chapter 11 Case uninterrupted.  Accordingly, on behalf of the Debtor, I respectfully submit that the Wage Motion should be granted.

(v)     **Debtor's Motion for an Order Authorizing, But Not Directing, the Debtor to Pay Certain Pre-Petition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "<u>Tax Motion</u>")**

58.     In the Tax Motion, the Debtor request entry of an order authorizing it to pay taxes and governmental fees (including sales, use, income, margin, business activity, personal property, franchise, and other miscellaneous taxes and business license, permit, annual report, and other miscellaneous fees) that accrued or arose in the ordinary course of business before the Petition Date.  The Debtor estimates that the following approximate amounts of taxes and fees in each category, totaling approximately $1.3 million in the aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
|---|---|
| Sales Taxes | $915,000.00 |
| Use Taxes | $0.00 |
| Income, Margin, and Business Activity Taxes | $10,000.00 |
| Personal Property Taxes | $350,000.00 |
| Business License/Permit Fees, Annual Report Fees, Franchise Taxes, and Other Miscellaneous Taxes and Fees | $10,000.00 |

59.     The Debtor must continue to pay all taxes and governmental fees when due to continue operating in certain jurisdictions.  Failure to pay all taxes and governmental fees (including taxes and fees that arose pre-petition) when due could result in taxing authorities suspending the Debtor's ability to operate, filing liens, and/or seeking relief from the automatic stay to take action against the Debtor.  In many jurisdictions, certain taxes, such as sales taxes, are collected in trust for the applicable taxing authorities.  Moreover, many jurisdictions may seek to impose liability on the Debtor's directors and officers for unpaid taxes, distracting the Debtor's key management personnel from the Debtor's reorganization efforts at a time when their commitment to the Debtor is most critical.

60.     The relief the Debtor seek in the Tax Motion will enable the Debtor to continue to operate its business during the Chapter 11 Case uninterrupted.   Accordingly, to prevent immediate, irreparable harm to the Debtor's business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtor and its estate and creditors and all other parties-in-interest in the Chapter 11 Case and, therefore, should be granted.

**(iv)     Debtor's Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving The Debtor's Proposed Form of Adequate Assurance of Future Payment, (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance and (IV) Scheduling A Final Hearing (the "<u>Utilities Motion</u>")**

61.     As of the Petition Date, the Debtor operates seventy-six retail stores located throughout the United States and maintains its corporate in Los Angeles, California (collectively, the "<u>Locations</u>").   Prior to the Petition Date, in the ordinary course of the Debtor's business, the Debtor spent approximately $2.745 million annually to provide various Utility Services for the Locations, with an average monthly cost of approximately $228,745.

62.     By this motion, the Debtor requests entry of an order (a) determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtor' proposed offer of adequate assurance (including an adequate assurance deposit of $115,000 and procedures whereby Utility Providers may request additional or different adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of pre-petition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance, (d) establishing procedures for the Utility Providers to object to the Debtor's proposed

adequate assurance procedures, and (e) determining that the Debtor is not required to provide any additional adequate assurance.

63.    I believe that uninterrupted Utility Services for the Locations are essential to the Debtor's ongoing operations.  Additionally, any interruption of Utility Services, even for a brief period of time, likely would negatively affect the Debtor's restructuring efforts.  I believe, and I am advised that the proposed Adequate Assurance Procedures and the proposed Adequate Assurance Deposit are necessary in the Chapter 11 Case because if such measures are not approved, the Debtor could be forced to address numerous requests by the Utility Providers for adequate assurance of payment in a disorganized manner during the critical first weeks of the Chapter 11 Case.  Moreover, absent the relief sought in the Utilities Motions, a Utility Provider could severely disrupt the Debtor's operations at a particular Location by unilaterally deciding, on or after the 30th day following the Petition Date, that it is not adequately protected and discontinue service or make an exorbitant demand for payment to continue service. Discontinuance of utility service could essentially shut down business at a Location; any significant disruption of operations could put the Chapter 11 Case in jeopardy.

64.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and will enable the Debtor to continue to operate its businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be granted.

**E.    Sale Motion**

65.    The Debtor's customer base is extremely loyal and passionate about the Love Culture brand.  The Debtor recognized that in order for the brand to thrive, the business needed either an injection of capital or a new owner with the resources to recapitalize the

business.    Accordingly, in December 2013 the Company began marketing efforts to solicit interest from prospective investors and/or purchasers of the Debtor's assets as a going concern. Despite extensive efforts, an appropriate investor and/or buyer was not found by the Board of the Directors.  As stated previously, the Debtor renewed its efforts and retained Consensus to assist them with, among other things, the continued marketing of the Debtors' assets and conducting a sale process.

66.    On or within the Petition Date, the Debtor will file a motion (the "Sale Motion") seeking entry of an order (the "Bidding Procedures Order") establishing bidding and auction procedures in connection with the sale of its assets, approving certain bid protections, scheduling an auction and setting a date and time for a sale hearing (the "Sale Hearing") and granting certain related relied and (ii) at the Sale Hearing the entry of an order approving and authorizing the sale to the Successful Bidder (as defined therein).  Although a stalking horse bid was not secured prior to the Petition Date, the Debtor reserves the right to seek stalking horse protections for any such bidder that comes forward prior to the auction date.

67.    As the Debtor's DIP Financing contains certain milestones with respect to the sale process,  the Debtor requests that the Court set a hearing to consider the Bidding Procedures Order on or before July 24, 2014; and set the Sale Hearing for on or before July 29, 2014.  The Debtor has managed to obtain the necessary financing to conduct the sale process along the timeframe proposed herein.  In the event that the Debtor is forced to prolong the sale process beyond the proposed timeline, the Debtor may not have sufficient liquidity to support a sale of the assets.

## CONCLUSION

68.    The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Case on the Debtor, its employees, vendors, constituents and creditors and result in maximum recoveries for its estate.  I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtor to operate effectively as debtor-in-possession.

69.    Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, to the best of my knowledge, information

and belief, the statements set forth in this Declaration are true and correct.

**LOVE CULTURE, INC.**
*Chapter 11 Debtor and Debtor in Possession*

Dated: July **16**, 2014

By: _____

J.E. Rick Bunka
Chief Restructuring Officer