Order Filed on
**7/17/2014**
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-2(c)

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
-and-
Gerald C. Bender, Esq.
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

*Proposed Counsel to the Debtor and
Debtor-in-Possession*

In re:

Love Culture Inc.[1]

                              Debtor.

Chapter 11

Case No. 14 – 24508 (NLW)

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH
COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE
PROTECTION, (V) MODIFYING AUTOMATIC STAY, AND
(VI) SCHEDULING A FINAL HEARING**

The relief set forth on the following pages, numbered 2 through 46, Exhibit A and

Exhibit B, is hereby ORDERED.

**DATED: 7/17/2014**

Honorable Novalyn L. Winfield
United States Bankruptcy Judge

---

[1]      The last four digits of the Debtor's tax identification number are 8782.

Page: 2
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

THIS MATTER having come before the Court upon the motion filed by Love Culture Inc., the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-4 of the Local Rules of the United States Bankruptcy Court District of New Jersey (the "Local Rules"), seeking entry of an interim (this "Interim Order") and final order (the "DIP Motion") *inter alia*:

(i)    authorizing, under section 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtor (the "Borrower") to obtain, secured, superpriority post-petition loans, advances and other financial accommodations (the "DIP Facility") on an interim basis for a period through and including the date of the Final Hearing (as defined below), in accordance with this Order and the Budget (as defined herein) and pursuant to the terms and conditions of that certain *Debtor-In-Possession Credit Agreement* dated July 16, 2014 (as amended, supplemented, restated, or otherwise modified from time to time) and all other related documents and agreements, including security agreements, deposit account control accounts, pledge agreements, guaranties and promissory notes (collectively, the "DIP Credit Agreement") by and among the Debtor, the Lenders party thereto (the "DIP Lenders" and each a "DIP Lender"), and Salus Capital Partners, LLC, as Administrative and Collateral Agent (the "DIP Agent") for the DIP Lenders, substantially in the form of Exhibit A attached to the DIP Motion; and

*Approved by Judge Novalyn L. Winfield July 17, 2014*

Page: 3
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

(ii)    authorizing the Debtor to execute and deliver the DIP Credit Agreement and to perform such other acts as may be necessary or desirable in connection with the DIP Credit Agreement;[2] and

(iii)    granting the DIP Facility and all obligations owing thereunder and under the DIP Credit Agreement to the DIP Agent and DIP Lenders (collectively, and including all "Obligations" as described in the DIP Credit Agreement, respectively, and, together, the "DIP Obligations") allowed superpriority administrative expense claim status pursuant to Bankruptcy Code section 364(c)(1) in the Chapter 11 Case and any Successor Case (as defined herein), subject to the priorities set forth herein; and

(iv)    authorizing the Debtor to use "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to Bankruptcy Code section 361 and 363 and Bankruptcy Rules 4001(b) and 6004; and

(v)    granting to the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein; and

(vi)    authorizing and directing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Credit Agreement as they become due, including, without limitation, continuing commitment or unused line fees, collateral audit fees, monitoring and exit fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Agent, all to the extent provided by and in accordance with the terms of the respective DIP Credit Agreement; and

---

[2]    Capitalized terms used but not defined have the meanings given to them in the DIP Credit Agreement.

Page: 4
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

(vii)    authorizing and directing the Debtor to pay the Prepetition Secured Obligations

(as defined herein), subject to the rights of parties in interest described in paragraphs 33 and 34

of this Interim Order; and

(viii)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Credit Agreement and this Interim Order; and

(ix)    granting the Prepetition Agent the Adequate Protection Liens and the Adequate

Protection Superpriority Claims based on the priming of its liens and subordination of its claims

to those of the DIP Agent and DIP Lenders; and

(x)    waiving any applicable stay as provided in the Bankruptcy Rule and providing for

the immediate effectiveness of this Interim Order; and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in

the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, *the Declaration of J.E. Bunka, Chief
Restructuring Officer of Love Culture Inc., in Support of the Debtor's Chapter 11 Petition and
First Day Motions* and the exhibits attached thereto filed concurrently with the DIP Motion, the

DIP Credit Agreement, and the evidence submitted or adduced and the arguments of counsel

made at the hearing held on the DIP Motion (the "Interim Hearing"); and notice of the Interim

Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014, and

Local Rule 4001-4; and the Interim Hearing to consider the interim relief requested in the DIP

Motion having been held and concluded; and all objections, if any, to the interim relief requested

in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing

to the Court that granting the interim relief requested is necessary to avoid immediate and

irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and

*Approved by Judge Novalyn L. Winfield July 17, 2014*

Page: 5
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
    Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
    Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
    Scheduling A Final Hearing
_____

reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation of the Debtor's businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*.    On July 16, 2014 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court") commencing the Case.

B.    *Debtor in Possession*.    The Debtor is continuing in the management and operation of its businesses and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

C.    *Jurisdiction and Venue*.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Committee Formation*.    As of the date hereof, the Office of the United States Trustee (the "U.S. Trustee") has not yet appointed any official committee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code (each, a "Statutory Committee").

E.    *Debtor's Stipulations*.    After consultation with its attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 33 herein, the

Page: 6
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

Debtor admits, stipulates, acknowledges and agrees that (collectively, paragraphs E(i) through E(v) below are referred to herein as the "Debtor's Stipulations"):

(i)    *Prepetition Credit Documents*.  As of the Petition Date, the Debtor had outstanding secured debt pursuant to that certain *Credit Agreement*, dated as of August 16, 2013 (as amended, modified and supplemented from time to time, the "Prepetition Credit Agreement" and together with all related documents, guaranties and agreements, the "Prepetition Credit Documents"), among the Debtor, the lenders from time to time party thereto (the "Prepetition Lenders"), and Salus Capital Partners, LLC, as administrative agent and collateral agent (in such capacity, the "Prepetition Agent"); the Prepetition Agent and the Prepetition Lenders are collectively referred to herein as the "Prepetition Creditors") and certain other parties thereto.

(ii)    *Prepetition Obligations*.  As of July 15, 2014, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Credit Documents was not less than $13,667,972 (collectively, together with any interest, fees, costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Credit Agreement, including all "Obligations" as described in the Prepetition Senior Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Secured Obligations").  As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtor granted first-priority security interests in and liens on substantially all of its personal property, including accounts, inventory, equipment and general intangibles (as more fully set forth in the Prepetition Credit Agreement, the "Prepetition Collateral") to the Prepetition Agent, for the benefit of the Prepetition Secured Parties (collectively, the "Prepetition Secured Liens") to secure repayment of the Prepetition Secured Obligations.

Page: 7
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

(iii)     *Validity, Perfection and Priority of Prepetition Liens and Obligations*.

The Debtor (for itself and its estate only, and without limiting the rights of other parties in

interest under paragraphs 33 and 34 of this Interim Order), and the Prepetition Secured Parties

acknowledge and agree that:  (a) as of the Petition Date, the Prepetition Secured Liens on the

Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b)

as of the Petition Date, the Prepetition Secured Liens have priority over any and all other liens, if

any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the

Prepetition Credit Agreement and only to the extent any such other liens otherwise permitted by

the Prepetition Senior Credit Documents were valid, binding, enforceable, properly perfected,

non-avoidable and senior in priority to the Prepetition Secured Liens as of the Petition Date (the

"Prepetition Permitted Liens")[3] (d) the Prepetition Secured Obligations constitute legal, valid,

binding, and non-avoidable obligations of the Debtor; (e) no offsets, challenges, objections,

defenses, claims or counterclaims of any kind or nature to any of the Prepetition Secured Liens

or the Prepetition Secured Obligations exist, and no portion of the Prepetition Secured Liens or

the Prepetition Secured Obligations is subject to any challenge or defense including, without

limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether

equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f)

the Debtor and its estate has no claims, objections, challenges, causes of actions, and/or choses in

action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code,

against any of the Prepetition Secured Parties or any of their respective affiliates, agents,

---

[3]        Subject to paragraph 33, nothing herein shall constitute a finding or ruling by this Court that any such
Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable.  Moreover, subject to
paragraph 33, nothing shall prejudice the right of any party in interest including, but not limited, to the Debtor, the
DIP Agent, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability,
perfection or extent of any such Prepetition Permitted Lien.  For avoidance of doubt, any alleged lien asserted by
Prime Business Credit, Inc. ("PRC") or United LC Capital, LLC ("United") shall not constitute a Prepetition
Permitted Lien.

Page: 8
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Credit Agreement or otherwise; (g) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Secured Obligations exceeded the amount of those obligations, and accordingly the Prepetition Secured Obligations are allowed secured claims within the meaning of section 506 of the Bankruptcy Code, of not less than $13,667,972 as of July 15, 2014, together with accrued and unpaid and hereafter accruing interest, fees (including, without limitation, attorneys' fees and related expenses), costs and other charges, and including the sum of $100,000 to secure contingent indemnification obligations arising under or related to the Prepetition Credit Agreement.

(iv)   *Cash Collateral*.   The Debtor acknowledges and stipulates that all of the Debtor's cash, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral and is Prepetition Collateral of the Prepetition Secured Parties.

(v)   *Default by the Debtor*.   The Debtor acknowledges and stipulates that it is in default under the Prepetition Credit Agreement.

F.   *Findings Regarding the Postpetition Financing*.

(i)   *Request for Postpetition Financing*.   The Debtor has requested from the DIP Agent and the DIP Lenders, and the DIP Agent and the DIP Lenders are willing to extend, the DIP Facility on the terms and conditions described herein and in the DIP Credit Agreement, including but not limited to the condition of repayment of a portion of the Prepetition Secured Obligations, and to permit use of Cash Collateral on the terms and conditions described herein to permit the Debtor to administer this Chapter 11 Case and fund its operations.   At the Final Hearing, the Debtor will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"),

Debtor:  In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders.  Notice

of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    *Immediate Need for Postpetition Financing and Use of Cash Collateral*.

The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is

immediate and critical in order to enable the Debtor to continue operations and to administer and

preserve the value of its estate.  The ability of the Debtor to finance its operations, maintain

business relationships, to pay its employees, protect the value of its assets and otherwise finance

its operations requires the availability of working capital from the DIP Facility and the use of

Cash Collateral, the absence of either of which would immediately and irreparably harm the

Debtor, its estate, its creditors and equity holders, and the possibility for a successful

administration of the Case.  The Debtor does not have sufficient available sources of working

capital and financing to operate its businesses or to maintain its properties in the ordinary course

of business without the DIP Facility and authorized use of Cash Collateral.

(iii)    *No Credit Available on More Favorable Terms*.    Given its current

financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain

financing from sources other than the DIP Agent on terms more favorable than the DIP Facility.

The Debtor has been unable to obtain unsecured credit allowable under Bankruptcy Code section

503(b)(1) as an administrative expense.  The Debtor has also been unable to obtain credit:  (a)

having priority over that of administrative expenses of the kind specified in sections 503(b),

507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and

its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property

of the Debtor and its estate that is subject to a lien.  Financing on a postpetition basis is not

otherwise available without granting the DIP Agent and DIP Lenders, (1) perfected security

interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired

Page: 10
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6) Scheduling A Final Hearing

_____

assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(iv)    *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Agent requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used (a) for the repayment in cash of Prepetition Secured Obligations on the Closing Date (other than contingent indemnification obligations) as provided in that certain payoff letter prepared by the Prepetition Agent (the "Payoff Letter", a copy of which has been approved by the DIP Agent), and, (b) in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the Debtor's budget (a copy of which is attached as Exhibit B hereto, as the same may be modified from time to time consistent with the terms of the DIP Credit Agreement, and subject to such variances as may be permitted thereby, the "Budget"), solely for (i) post-petition operating expenses and other working capital, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including professional fees, and (iv) as otherwise permitted under the DIP Credit Agreement, as applicable.  The repayment of the Prepetition Secured Obligations in accordance with this Interim Order and the Payoff Letter is necessary, as the Prepetition Agent has not otherwise consented to the use of its Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Agent is not willing to provide the DIP Facility unless the Prepetition Secured Obligations (other than contingent indemnification obligations) are paid upon the closing of the DIP Facility (subject to the terms of the Payoff Letter and this Interim Order).  Such payments will not prejudice the Debtor or its estate, because payment of such amounts is subject to the rights of parties in interest under paragraphs 33 and 34 herein.

Page: 11
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

(v)     *Application of Proceeds of DIP Collateral.*  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtor and the DIP Agent have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 18 of this Interim Order.

G.     *Adequate Protection*.

(i)     Upon the closing of the DIP Facility, the Debtor shall pay to the Prepetition Agent the amounts required under the Payoff Letter.  Adequate protection shall be provided to the Prepetition Agent and the Prepetition Secured Lenders, by the Adequate Protection Liens (as defined herein) to secure the Adequate Protection Superpriority Claims (as defined herein) with respect to the Surviving Obligations.  For the avoidance of doubt, the Adequate Protection Liens and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens and the DIP Carve Out, and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim (as defined herein).

H.     *Sections 506(c) and 552(b)*.  In light of the DIP Agent's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out (as defined herein), upon entry of the Final Order, the DIP Agent is entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

I.     *Good Faith of the DIP Agent*.

(i)     *Willingness to Provide Financing*.  The DIP Agent has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Credit Agreement and the payoff of the Prepetition Secured Obligations in accordance with the terms of

Page: 12
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

the Payoff Letter; and (c) entry of findings by this Court that such financing is essential to the

Debtor's estate, that the DIP Agent and DIP Lenders are extending credit to the Debtor pursuant

to the DIP Credit Agreement in good faith, and that the DIP Agent's and DIP Lenders' claims,

superpriority claims, security interests, liens, rights, and other protections granted pursuant to

this Interim Order and the DIP Credit Agreement will have the protections provided in section

364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal,

modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any

other order.

            (ii)    *Business Judgment and Good Faith Pursuant to section 364(e).*  The terms

and conditions of the extension of credit under the DIP Facility and this Interim Order are fair,

just and reasonable under the circumstances, are ordinary and appropriate for secured financing

to a debtor-in-possession, reflect the Debtor's exercise of prudent business judgment consistent

with its fiduciary duties, and are supported by reasonably equivalent value and consideration.

The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length

among the Debtor and the DIP Agent, with all parties being represented by counsel.  The use of

Cash Collateral and credit to be extended under the DIP Credit Agreement shall be deemed to

have been so allowed, advanced, made, used or extended in good faith, and for valid business

purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP

Agent is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy

Code and this Interim Order.

        J.    *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the

DIP Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or

hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee for the District of New

Jersey; (iii) the Internal Revenue Service; (iii) the parties included on the Debtor's consolidated

Page: 13
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

---

list of twenty (20) largest unsecured creditors; (iv) Prime Business Credit, Inc., 1055 West 7th

Street, Suite 2200, Los Angeles, CA 90017 attn.: Kevin Hong, Account Executive; and (v)

United LC Capital, LLC, 3530 Wilshire Blvd., Suite 695, Los Angeles, CA 90010.  Under the

circumstances, the notice provided by the Debtor of the Motion, the Interim Hearing and the

relief granted under this Order constitutes due and sufficient notice thereof and complies with

Bankruptcy Rule 4001(c) and Local Rule 4001-4, and no other or further notice is or shall be

required.

K.    *Immediate Entry*.   Sufficient cause exists for immediate entry of this Order

pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the DIP Motion and the record

before the Court with respect to the DIP Motion, and good and sufficient cause appearing

therefor,

IT IS HEREBY ORDERED that:

1.    Interim Financing Approved.  The DIP Motion is granted on an interim basis, the

Interim Financing (as defined herein) is authorized and approved on an interim basis, and the use

of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth

in this Interim Order.

2.    Objections Overruled.  All objections to the Interim Financing to the extent not

withdrawn or resolved are hereby overruled.

### DIP FACILITY AUTHORIZATION

3.    Authorization of the DIP Financing, DIP Credit Agreement and Payoff Letter.

The Debtor is expressly and immediately authorized and empowered to execute and deliver the

DIP Credit Agreement and the Payoff Letter, to incur and to perform the DIP Obligations in

Page: 14
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

accordance with, and subject to the terms of this Interim Order, the DIP Credit Agreement, the

Payoff Letter and the Budget, to deliver all instruments and documents that may be necessary or

required for performance by the Debtor under the DIP Facility and the creation and perfection of

the DIP Liens described in and provided for by this Interim Order and the DIP Credit

Agreement, and, subject to the rights of third parties pursuant to paragraphs 33 and 34 below, to

pay and perform all obligations under the Payoff Letter in accordance with the terms set forth

therein and in this Interim Order, including to provide for (x) the releases in favor of each of the

Prepetition Secured Parties and their related parties and (y) repayment in cash of the Prepetition

Secured Obligations (other than the Surviving Obligations).  The Debtor is hereby authorized to

pay the principal, interest, fees, expenses and other amounts described in the DIP Credit

Agreement as such become due and without need to obtain further Court approval, including,

without limitation, unused facility fees, continuing commitment fees, monitoring and exit fees,

collateral audit fees, the reasonable fees and disbursements of the DIP Agent's and the DIP

Lenders' attorneys, advisers, accountants, and other consultants, whether or not the transactions

contemplated hereby are consummated, all to the extent provided in the DIP Credit Agreement,

with invoices to be provided in accordance with paragraph 47 below.  All collections and

proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance

recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim

Order and the DIP Credit Agreement.  Upon execution and delivery, the DIP Credit Agreement

shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its

estate in accordance with their terms.  Upon execution and delivery, the Payoff Letter shall

represent a valid and binding obligation of the Debtor, enforceable against the Debtor and its

estate in accordance with their terms, but subject only to the rights of third parties pursuant to

paragraphs 33 and 34 below.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Page: 15
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

4.        <u>Authorization to Borrow</u>.  Until the Termination Date (as defined in the DIP

Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves

set forth in the DIP Credit Agreement, the DIP Facility, and this Interim Order, and in order to

prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to

request extensions of credit under the DIP Facility (the "<u>Interim Financing</u>").

5.        <u>DIP Obligations</u>.  The DIP Credit Agreement and this Interim Order shall

constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which

DIP Obligations shall be enforceable against the Debtor, its estate and any successor thereto,

including without limitation, any trustee or other estate representative appointed in the Case, or

any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case

(collectively, "<u>Successor Case</u>").   Upon entry of this Interim Order, the DIP Obligations will

include all loans and any other indebtedness or obligations, contingent or absolute, which may

now or from time to time be owing by the Debtor to the DIP Agent, the DIP Lenders and their

related parties under the DIP Credit Agreement or this Interim Order, including, without

limitation, all principal, accrued interest, costs, fees, expenses, reimbursement and indemnity

obligations and other amounts owed pursuant to the DIP Credit Agreement.

6.        <u>Postpetition Liens and Collateral</u>.

(a)        Effective immediately upon the entry of this Interim Order and the

payment of the Payoff Amount (as defined in the Payoff Letter), pursuant to sections 364(c)(2),

364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for itself and the ratable benefit of

the DIP Lenders party to the DIP Credit Agreement) is hereby granted, continuing valid, binding,

enforceable, non-avoidable and automatically and properly perfected postpetition security

interests in and liens (collectively, the "<u>DIP Liens</u>") on any and all presently owned and hereafter

Page:  16
Debtor:  In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

acquired assets and real and personal property of the Debtor, including, without limitation, the

following (the "DIP Collateral"):

> (i)      all Accounts[4];
>
> (ii)     all Goods, including Equipment, Inventory and Fixtures;
>
> (iii)    all Documents, Instruments and Chattel Paper;
>
> (iv)     all Letters of Credit and Letter-of-Credit Rights;
>
> (v)      all Securities Collateral;
>
> (vi)     all Investment Property;
>
> (vii)    all Intellectual Property Collateral;
>
> (viii)   all Commercial Tort Claims;
>
> (ix)     all General Intangibles (including, without limitation, all Payment

Intangibles);

> (x)      all Deposit Accounts (including, without limitation, the Concentration

Account);

> (xi)     all Supporting Obligations;
>
> (xii)    all money, cash or cash equivalents;
>
> (xiii)   all credit balances, deposits and other property now or hereafter held or

received by or in transit to the DIP Agent or at any other depository or other institution from or

for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection

or otherwise;

> (xiv)    all proceeds of leases of real property and all owned real property;[5]

_____

[4]        All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP
Credit Agreement.  All terms not specifically defined in the DIP Credit Agreement shall have the meanings ascribed
to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Page: 17
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing

_____

(xv)    effective upon the entry of the Final Order, all claims or causes of action or the proceeds thereof to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (the "Avoidance Actions");

(xvi)   effective upon the entry of the Final Order, the Debtor's rights under section 506(c) and section 550 of the Bankruptcy Code and the proceeds thereof;

(xvii)  to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Debtor;

(xviii) all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xix)   to the extent not otherwise included, all Proceeds, tort claims, insurance claims, contract rights, rights to the payment of money, and other rights to payment not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

(b)     Effective upon the entry of the Interim Order and the payment of the Payoff Amount, all DIP Liens and the DIP Carve Out (as defined herein) shall each be and remain at all times senior to the Prepetition Secured Liens, and all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgements, credit card agreements, collateral access agreements, landlord

_____

[5]     For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property ("Leased Premises") and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

Page: 18
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs

broker agency agreements, subordination agreements, freight forwarder agreements constituting

the Prepetition Credit Agreement, all Uniform Commercial Code financing statements,

mortgages, collateral assignments, notices of lien, all existing filings with the United States

Patent and Trademark Office or the United States Copyright Office with respect to the

recordation of an interest in the intellectual property of the Debtor which were filed by the

Prepetition Agent, and all other similar documents, instruments or agreements granting,

establishing or evidencing a lien on Prepetition Collateral, shall be deemed to be delivered and/or

filed in connection with the DIP Facility, shall constitute DIP Credit Documents and shall remain

in full force and effect without any further action by the Debtor, the DIP Agent or any other

person, and any and all references in any such agreements or documents to the "Credit

Agreement" shall hereafter be deemed to mean and refer to the DIP Credit Agreement, and any

and all references in any such agreements or documents to the "Loan Documents" shall hereafter

be deemed to mean and refer to the DIP Credit Documents, in each case as amended, modified,

supplemented or restated and in effect from time to time.

     7.   <u>DIP Lien Priority</u>.

     (a)   *DIP Liens*.  The DIP Liens shall be junior only to the (i) DIP Carve Out,

and (ii) the Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are

senior to the Prepetition Secured Liens immediately prior to the Petition Date),[6] and effective

upon the payment of the Payoff Amount, shall otherwise be senior in priority and superior to the

Prepetition Secured Liens, the Adequate Protection Liens (as defined herein) and Adequate

Protection Superpriority Claims (as defined herein) and any other security, mortgage, collateral

interest, lien or claim on or to any of the DIP Collateral.

---

[6]    For avoidance of doubt, the DIP Liens shall be senior in priority and superior to any alleged lien or claim asserted by PBC and/or United on or to any of the DIP Collateral.

Page: 19
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

(b)    Other than as set forth herein or as further ordered by the Court, the DIP

Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or

hereinafter granted in the Chapter 11 Case or any Successor Case.  The DIP Liens shall be valid

and enforceable against any trustee or other estate representative appointed in the Chapter 11

Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under chapter

7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the

Chapter 11 Case or any Successor Case.  The DIP Liens shall not be subject to challenge under

sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for

the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with

or senior to the DIP Liens.

(c)    *Prepetition Secured Liens*.  For the avoidance of doubt, effective upon

payment of the Payoff Amount, the Prepetition Secured Liens shall be junior to the (i) DIP Carve

Out; (ii) DIP Liens; (iii) the Adequate Protection Liens described in paragraph 12(b) below; (iv)

the Adequate Protection Superpriority Claims; and (v) Prepetition Permitted Liens (as and to the

extent that such Prepetition Permitted Liens are senior to the Prepetition Secured Liens

immediately prior to the Petition Date).  For the avoidance of doubt, effective upon payment of

the Payoff Amount, the Prepetition Secured Liens shall secure the Surviving Obligations.

8.    DIP Superpriority Claim.

(a)    *DIP Agent Superpriority Claim*.  Upon entry of this Interim Order and

payment of the Payoff Amount, the DIP Agent (for itself and the ratable benefit of the DIP

Lenders) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed

superpriority administrative expense claim in the Chapter 11 Case and any Successor Case

(collectively, the "DIP Superpriority Claim") for all DIP Obligations.  Effective upon payment of

the Payoff Amount, the DIP Superpriority Claim shall be subordinate only to the DIP Liens, the

Page:  20
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

DIP Carve Out as defined in paragraph 33 below, and Prepetition Permitted Liens (as and to the

extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately

prior to the Petition Date), and shall otherwise have priority over any and all administrative

expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 503(b) and

507(b), as provided under section 364(c)(1) of the Bankruptcy Code.

(b)      *Priority of DIP Superpriority Claim.* Effective upon payment of the

Payoff Amount, the DIP Superpriority Claim shall be payable from and have recourse to all pre-

and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in

full in cash of the DIP Obligations, the DIP Carve Out and amounts secured by the Prepetition

Permitted Liens (as and to the extent that such Prepetition Permitted Liens are senior to the

Prepetition Secured Liens immediately prior to the Petition Date).  If necessary, upon entry of

the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to

Avoidance Actions.

9.      No Obligation to Extend Credit.  The DIP Agent and the DIP Lenders shall not

have any obligation to make any loan or advance under the DIP Credit Agreement unless all of

the conditions precedent to the making of such extension of credit or the issuance of such letter

of credit under the applicable DIP Credit Agreement and this Interim Order have been satisfied

in full or waived by the DIP Agent in its sole discretion.

10.      Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtor shall

use advances of credit under the DIP Facility only for the purposes specifically set forth in this

Interim Order, the DIP Credit Agreement, the Payoff Letter, and in compliance with the Budget,

a copy of which has been delivered to the DIP Agent.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Page:  21
Debtor:  In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

---

## AUTHORIZATION TO USE CASH COLLATERAL

11.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Credit Agreement, and in accordance with the Budget, the Debtor is authorized to use Cash Collateral until the Termination Date; <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined herein) the Debtor may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll and to pay expenses critical to the preservation of the Debtor and its estate as agreed by the DIP Agent, in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business (which shall be subject to further Orders of this Court), or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Credit Agreement, and in accordance with the Budget.  The Debtor may also, in its discretion, honor prepetition gift cards and customer credits for a period of two-weeks after the Petition Date.

12.    <u>Payoff Letter and Adequate Protection Liens</u>.

(a)    *Prepetition Agent – Payoff Letter*.  The Debtor and the Prepetition Agent shall comply with the terms and provisions of the Payoff Letter.  The Debtor's residual interest in any amounts payable or potentially payable to the Debtor under the terms of the Payoff Letter shall be subject to the DIP Liens in accordance with the priorities set forth in this Interim Order and the DIP Credit Agreement.

(b)    *Prepetition Agent – Adequate Protection Liens*.  The Prepetition Agent (for itself and the ratable benefit of the Prepetition Secured Parties) is hereby granted, pursuant to Bankruptcy Code sections 361 and 363, valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and under all DIP Collateral (the "<u>Adequate Protection Liens</u>").  The Adequate Protection Liens granted to the

Page: 22
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

Prepetition Agent shall secure the Surviving Obligations.  The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject to (i) the DIP Liens, (ii) the Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the Petition Date), and (iii) the DIP Carve Out.

(c)    *Treatment of Adequate Protection Liens.*  Other than as set forth herein or as further ordered by the Court, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law in the Chapter 11 Case or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.

13.    Adequate Protection Superpriority Claims.

(a)    *Superpriority Claim of Prepetition Agent.*  As further adequate protection of the interests of the Prepetition Agent and Prepetition Secured Parties with respect to the Surviving Obligations, the Prepetition Agent is hereby granted (for itself and the ratable benefit of the Prepetition Secured Parties) an allowed administrative claim against the Debtor's estate under sections 503 and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Agent's interests in the Prepetition Collateral.

(b)    *Priority of Adequate Protection Superpriority Claims.*  The Adequate Protection Superpriority Claim granted to the Prepetition Agent and Prepetition Secured Parties

Page: 23
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

shall be junior to the DIP Carve Out, Prepetition Permitted Liens (as and to the extent such

Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the

Petition Date), the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Liens,

and shall otherwise have priority over administrative expenses of the kinds specified in or

ordered pursuant to sections 503(b), and 507(b) of the Bankruptcy Code.

### PROVISIONS COMMON TO DIP FINANCING AND USE OF CASH COLLATERAL AUTHORIZATIONS

14.    <u>Amendments</u>.  The DIP Credit Agreement may from time to time be amended,

modified or supplemented by the parties thereto without notice or a hearing if:  (i) in the

reasonable judgment of the Debtor and the DIP Agent, the amendment, modification, or

supplement (A) is in accordance with the DIP Credit Agreement, (B) is not prejudicial in any

material respect to the rights of third parties, and (C) has been consented to by the DIP Agent,

and (ii) a copy (which may be provided through electronic mail or facsimile) of the amendment,

modification or supplement is provided to counsel for any Statutory Committee and the U.S.

Trustee at least one (1) Business Day prior to the effective date of the amendment, modification

or supplement.

15.    <u>Budget Maintenance</u>.  The Budget and any modification to, or amendment or

update of, the Budget shall be in form and substance reasonably acceptable to the DIP Agent and

approved by the DIP Agent in its sole discretion.  The Debtor shall comply with and update the

Budget from time to time in accordance with the DIP Credit Agreement (provided that any

update shall be in form and substance reasonably acceptable to the DIP Agent and approved by

the DIP Agent in its sole discretion), but in any event not less than on a weekly basis (with

delivery to the DIP Agent on or before Thursday of each week and to the United States Trustee

and the Statutory Committee, if any, each week after delivery to the DIP Agent).

Page: 24
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing

_____

16.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; and (b) authorize the Debtor to pay, and the DIP Agent and Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order and the Payoff Letter.

17.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    *Automatic Perfection of Liens*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action  to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent or the Prepetition Secured Parties to the priorities granted herein (including, for the avoidance of doubt, entering into any blocked, lockbox or deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement and/or taking possession of original instruments or securities, specifically describing any commercial tort claim or similar actions required under applicable non-bankruptcy law to establish or perfect any security interest or lien). Notwithstanding the foregoing, the DIP Agent is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens, and take all such other action deemed necessary or desirable by the DIP

Page:  25
Debtor:  In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing
_____

Agent to establish or perfect the DIP Liens, and all such financing statements, mortgages, notices

and other documents shall be deemed to have been filed or recorded as of the Petition Date;

provided, however, that no such filing, recordation or other action shall be necessary or required

in order to create, perfect or enforce the DIP Liens.  The Debtor is authorized to execute and

deliver promptly upon demand to the DIP Agent all such financing statements, mortgages,

control agreements, notices and other documents as the DIP Agent may reasonably request.  The

DIP Agent, in its sole discretion, may file a photocopy of this Interim Order as a financing

statement with any filing or recording office or with any registry of deeds or similar office, in

addition to or in lieu of such financing statements, notices of lien or similar instrument.  Should

the DIP Agent choose and attempt to file, record or perform an act to perfect the liens or security

interests granted herein, no defect or failure in connection with such attempt shall in any way

limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition

liens and security interests granted herein by virtue of the entry of this Interim Order.

    18.    Application of Proceeds of DIP Collateral.  As a condition to the entry into the

DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use

Cash Collateral, the Debtor has agreed that the proceeds of DIP Collateral shall be applied as

follows:

    (a)    (i) all payments received by the DIP Agent in respect of any DIP

Obligation and all funds transferred and credited to the "Concentration Account" maintained by

the Debtor at Wells Fargo Bank, National Association and (ii) all net proceeds from any

Disposition of DIP Collateral, each shall be applied:  *first*, to payment of fees, costs and

expenses, including Credit Party Expenses payable and reimbursable by the Debtor under the

DIP Credit Agreement and the other DIP Credit Agreement; *second*, to payment of interest with

respect to the DIP Obligations, *third*, to payment of all other DIP Obligations in accordance with

Page: 26
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

the DIP Credit Agreement; and *fourth*, to the Debtor's operating account, or for the account of

and paid to whoever may be lawfully entitled thereto.

(b)    The Debtor shall not, directly or indirectly, voluntarily purchase, redeem,

defease, prepay any principal of, premium, if any, interest or other amount payable in respect of

any indebtedness prior to its scheduled maturity, other than the DIP Obligations and the

Prepetition Secured Obligations (each in accordance with the DIP Credit Agreement, the Payoff

Letter and this Interim Order) and obligations authorized under the Debtor's "first-day" orders.

19.    <u>Proceeds of Subsequent Financing</u>.  If the Debtor, any trustee, any examiner with

enlarged powers, any responsible officer or any other estate representative subsequently

appointed in the Chapter 11 Case or any Successor Case shall obtain credit or incur debt pursuant

to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement

at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP

Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, including

subsequent to the confirmation of any plan of reorganization or liquidation with respect to the

Debtor and the Debtor's estate, then all the cash proceeds derived from such credit or debt shall

immediately be turned over to the DIP Agent to be applied as set forth in paragraph 18(a) herein;

20.    <u>Maintenance of DIP Collateral</u>.  Until the payment in full in cash of all DIP

Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend

credit under the DIP Facility, as provided therein, the Debtor shall:  (a) insure the DIP Collateral

as required under the DIP Facility; and (b) maintain the cash management system which has

been agreed to by the DIP Agent or as otherwise required by the DIP Credit Agreement.  Nothing

21.    <u>Disposition of DIP Collateral; Rights of DIP Agent</u>.  Unless otherwise authorized

by the Court, the Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any

portion of the DIP Collateral except as permitted by the DIP Credit Agreement.   Nothing

Page: 27
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
    Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
    Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
    Scheduling A Final Hearing

_____

provided herein shall limit the right of the DIP Agent or the DIP Lenders to object to any proposed disposition of the DIP Collateral.

22.    <u>Termination Date</u>.  On the Termination Date, (i) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will automatically terminate, and (ii) all authority to use Cash Collateral derived from the proceeds of DIP Collateral shall cease, <u>provided</u>, <u>however</u>, that during the Remedies Notice Period (as defined herein), the Debtor may use Cash Collateral solely as set forth in paragraph 11 herein.

23.    <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement (unless the DIP Agent, in its sole discretion, elects to waive such Event of Default in writing) shall constitute an event of default under this Interim Order (each, an "<u>Event of Default</u>").

24.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    *DIP Facility Termination.*  Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Agent may in its discretion (i) declare the DIP Facility terminated (such declaration, a "<u>Termination Declaration</u>") or (ii) send a written reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent.  Upon the issuance of a Termination Declaration, at the DIP Agent's option: (I) all or any portion of the Commitment of the DIP Agent and the DIP Lenders to make loans or otherwise extend credit may be suspended or terminated; (II) all DIP Obligations may be deemed immediately due and payable; and (III) after three (3) Business Days from the Termination Declaration Date, any right or ability of the Debtor to use any Cash Collateral (other than as expressly set forth in this Interim Order during the Remedies Notice Period) may be terminated, reduced or restricted by the DIP Agent, provided that, during such three (3) Business Day period, the Debtor may use

Page: 28
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

Cash Collateral in accordance with the Budget solely to meet payroll and to pay expenses critical

to the preservation of the Debtor and its estate as agreed by the DIP Agent, in its sole and

absolute discretion.  With respect to the DIP Collateral, following the Termination Declaration,

subject to the Remedies Notice Period, the DIP Agent and the DIP Lenders may exercise all

rights and remedies available to them under the DIP Credit Agreement or applicable law against

the DIP Collateral.  Without limiting the foregoing, the DIP Agent and the DIP Lenders may,

subject to the Remedies Notice Period, (i) enter onto the premises of the Debtor in connection

with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and remedies

provided to DIP Agent and the DIP Lenders under the DIP Credit Agreement or at law or equity,

including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order

and the Final Order.  Following the termination of the Remedies Notice Period, the DIP Agent

may require the Debtor to seek authority from the Court to retain an Approved Liquidator for the

purpose of conducting a liquidation or "going out of business" sale and/or the orderly liquidation

of the DIP Collateral and, if Debtor refuses to seek such authority, the DIP Agent shall be

entitled to seek such authority directly.

> (b)     *Notice of Termination*.  Any Termination Declaration shall be given by

facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, counsel

to any Statutory Committee, and the U.S. Trustee (the earliest date any such Termination

Declaration is made shall be referred to herein as the "Termination Declaration Date").  The DIP

Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral

shall automatically cease on the Termination Declaration Date, except as provided in paragraphs

11 and 33 of this Interim Order.  Any automatic stay otherwise applicable to the DIP Agent and

the DIP Lenders is hereby modified so that three (3) business days after the Termination

Declaration Date (the "Remedies Notice Period"), the DIP Agent and the DIP Lenders shall be

Page: 29
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

---

entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP

Credit Agreement and this Interim Order and shall be permitted to satisfy the DIP Superpriority

Claim and the DIP Liens, subject only to the DIP Carve Out and Prepetition Permitted Liens (as

and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens

immediately prior to the Petition Date).  During the Remedies Notice Period, the Debtor shall be

entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether

an Event of Default has occurred and/or is continuing.  Unless the Court determines during the

Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the

automatic stay shall automatically be terminated at the end of the Remedies Notice Period

without further notice or order and the DIP Agent and the DIP Lenders shall be permitted to

exercise all remedies set forth herein, in the DIP Credit Agreement and as otherwise available at

law against the DIP Collateral, without further order of or application or motion to the Court, and

without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or

otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any

other rights and remedies granted to the DIP Agent with respect thereto pursuant to the DIP

Credit Agreement, or this Interim Order.

(c)    *Access to Leased Premises.* The DIP Agent's exercise of its remedies

pursuant to this paragraph 24 shall be subject to: (x) pre-existing rights of the DIP Agent and the

applicable landlord under applicable nonbankruptcy law, (y) consent of the applicable landlord,

or (z) further order of the Court following notice and a hearing.

25.    Good Faith Under section 364 of the Bankruptcy Code; No Modification or Stay
of this Interim Order.    The DIP Agent and each DIP Lender have acted in good faith in

connection with the DIP Credit Facility and this Interim Order and their reliance on this Interim

Order is in good faith.  Based on the findings set forth in this Interim Order and the record made

Page: 30
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing
_____

during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in

the event any or all of the provisions of this Interim Order are hereafter modified, amended or

vacated by a subsequent order of this Court, or any other court, the DIP Agent and each of the

DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.

Any such modification, amendment or vacatur shall not affect the validity and enforceability of

any advances previously made or made under the DIP Credit Facility, or lien, claim or priority

authorized or created hereby, provided that the Interim Order was not stayed by court order after

due notice had been given to the DIP Agent at the time the advances were made or the liens,

claims or priorities were authorized and/or created.  Any liens or claims granted to the DIP

Agent and the DIP Lenders hereunder arising prior to the effective date of any such modification,

amendment or vacatur of this Interim Order shall be governed in all respects by the original

provisions of this Interim Order, including entitlement to all rights, remedies, privileges and

benefits granted herein, provided that the Interim Order was not stayed by court order after due

notice had been given to the DIP Agent and each DIP Lender at the time the advances were made

or the liens, claims or priorities were authorized and/or created.

      26.    <u>DIP and Other Expenses</u>.  The Debtor is authorized and directed to pay all

reasonable out-of-pocket expenses of the DIP Agent and the DIP Lenders in connection with the

DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), to the

extent provided in the DIP Credit Agreement, whether or not the transactions contemplated

hereby are consummated, including, without limitation, legal, accounting, collateral examination,

monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants,

and indemnification and reimbursement of fees and expenses, upon the Debtor's receipt of

invoices for the payment thereof.  Payment of all such fees and expenses shall not be subject to

allowance by the Court and professionals for the DIP Agent and the DIP Lenders shall not be

Page: 31
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

required to comply with the U.S. Trustee fee guidelines.  Notwithstanding the foregoing, at the

same time such invoices are delivered to the Debtor, the professionals for the DIP Agent and the

DIP Lenders shall deliver a copy of their respective invoices to counsel for any Statutory

Committee and the U.S. Trustee, redacted as necessary with respect to any privileged or

confidential information contained therein.  Any objections raised by the Debtor, the U.S.

Trustee or any Statutory Committee with respect to such invoices within ten (10) days of the

receipt thereof will be resolved by the Court.  In the event of any objection, the provisions of

section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy

Procedure shall apply.  Pending such resolution, the undisputed portion of any such invoice will

be paid promptly by the Debtor.  Notwithstanding the foregoing, the Debtor is authorized and

directed to pay on the Closing Date all reasonable fees, costs and expenses of the DIP Agent, the

DIP Lenders and the Prepetition Agent incurred on or prior to such date without the need for any

professional engaged by the DIP Agent, the DIP Lenders or the Prepetition Agent to first deliver

a copy of its invoice as provided for herein.

      27.   <u>Indemnification</u>.

      (a)   The Debtor shall indemnify and hold harmless the DIP Agent and the DIP

Lenders and each of their respective shareholders, members, directors, agents, officers,

subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their

respective capacities as such, from and against any and all damages, losses, settlement payments,

obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and

reasonable costs and expenses incurred, suffered, sustained or required to be paid by an

indemnified party of every nature and character arising out of or related to the DIP Credit

Agreement, the DIP Facility or the transactions contemplated thereby and by this Interim Order,

whether such indemnified party is party thereto, as provided in and pursuant to the terms of the

Page: 32
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
    Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
    Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
    Scheduling A Final Hearing
_____

DIP Credit Agreement and as further described therein and herein, or in connection with the

Case, any plan, or any action or inaction by the Debtor, in each case except to the extent

resulting from such indemnified party's gross negligence or willful misconduct as finally

determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity

includes indemnification for each of the DIP Agent's and the DIP Lenders' exercise of

discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation

therefor, each of the DIP Agent and the DIP Lenders shall be entitled to select its own counsel

and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable

fees and expenses of such counsel.

   (b) *DIP Indemnity Account*.  Upon the conclusion of the Remedies Notice

Period, the Debtor shall pay $100,000 from proceeds of the DIP Collateral into an indemnity

account (the "DIP Indemnity Account") subject to first priority liens of the DIP Agent.  The DIP

Indemnity Account shall be released and the funds applied in accordance with paragraph 18 of

this Interim Order upon the earlier to occur of (a) the receipt by the DIP Agent and each DIP

Lender of a release from the Debtor and its estate acceptable to the DIP Agent and each DIP

Lender in its sole discretion and (b) the closing of an "exit financing" or similar financing or

transaction to which the Debtor and the DIP Agent are parties on terms and conditions

acceptable to the DIP Agent in its sole discretion.

   28. Proofs of Claim.  Any order entered by the Court in relation to the establishment

of a bar date for any claims (including without limitation administrative claims) in the Chapter

11 Case or any Successor Case shall not apply to the DIP Agent, the DIP Lenders or Prepetition

Secured Parties.  None of the DIP Agent, the DIP Lenders and Prepetition Secured Parties will

be required to file proofs of claim or requests for approval of administrative expenses in the

Chapter 11 Case or any Successor Case, and the provisions of this Interim Order relating to the

Page: 33
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

amount of the DIP Obligations, the DIP Superpriority Claim and the Prepetition Secured

Obligations shall constitute timely filed proofs of claim and/or administrative expense requests.

29.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and

information afforded the DIP Agent and the DIP Lenders under the DIP Credit Agreement, the

Debtor shall be, and hereby is, required to afford representatives, agents and/or employees of the

DIP Agent and the DIP Lenders reasonable access to the Debtor's premises and its books and

records in accordance with the DIP Credit Agreement, and shall reasonably cooperate, consult

with, and provide to such persons all such information as may be reasonably requested.   In

addition, the Debtor authorizes its independent certified public accountants, financial advisors,

investment bankers and consultants to cooperate, consult with, and provide to the DIP Agent and

the DIP Lenders all such information as may be reasonably requested with respect to the

business, results of operations and financial condition of the Debtor.

30.    <u>DIP Carve Out</u>.

(a)     As used in this Interim Order, the "<u>DIP Carve Out</u>" means, collectively,

the following fees and expenses: (i) all statutory fees required to be paid to (a) the Clerk of the

Bankruptcy Court pursuant to 28 U.S.C. § 1930(a), and (b) to the Office of the United States

Trustee pursuant to 28 U.S.C. § 1930(a)(6), as determined by agreement of the United States

Trustee or by final order of the Court; (ii) reasonable fees and expenses of a Trustee under

section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; and (iii) the

aggregate amount of accrued and unpaid professional fees and expenses of the Debtor and any

Statutory Committee, retained by either of them by final order of the Court (which order has not

been reversed, vacated or stayed unless such stay is no longer effective) under sections 327, 328,

or 1103(a) of the Bankruptcy Code (the "<u>Case Professionals</u>"), to the extent such fees and

expenses are allowed and payable pursuant to an order of the Court (which order has not been

reversed, vacated or stayed) ("<u>Allowed Professional Fees</u>") and the reimbursement of out-of-

pocket expenses allowed by the Bankruptcy Court incurred by the Statutory Committee members

Page: 34
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) ("Committee Fees"), which amounts shall be equal to the sum of (a) $300,000 (which is being deposited into the Professional Fee Escrow Account on the Closing Date in accordance with the Budget) allocated as follows: (I) $125,000 for Lowenstein Sandler LLP, (II) $125,000 for PriceWaterhouseCoopers, and (III) $50,000 for Committee Professionals and Committee Fees; and (b) an amount[7] which shall be funded into the Professional Fee Escrow Account on Thursday of each week (or such other day of the week selected by the Debtor) pursuant to and in accordance with the Budget (the "Periodic Compensation Fees"), provided that the DIP Agent has not delivered a Termination Declaration.  No portion of the DIP Carve Out, any Cash Collateral or proceeds of the Loans may be used in violation of this Interim Order, including paragraph 33 hereof.  Notwithstanding anything to the contrary contained in this Interim Order, (A) until the DIP Agent has delivered a Termination Declaration, the Debtor shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated in the Budget to fund the Periodic Compensation Fees into the Professional Fee Escrow Account as set forth under clause (b) of this paragraph, and (B) the Debtor shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, fees and expenses of Case Professionals payable under 11 U.S.C. § 330 and § 331 pursuant to Court order, regardless of whether an Event of Default has occurred and is continuing at such time.  Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Agent for application in accordance with paragraph 19 of this Interim Order.  The DIP Liens are hereby deemed to attach to the Debtor's residual interest in such excess.

(b)     *Professional Fee Escrow*.  So long as the DIP Agent has not delivered a Termination Declaration, the Debtor shall remit the amounts of Periodic Compensation Fees set

---

[7]  As reflected in the Budget filed with the Motion, the amount of $372,000 shall be funded during the week of July 19, 2014, the amount of $365,000 shall be funded during the week of July 26, 2014, and the amount of $372,000 shall be funded during the week of July 31, 2014.

Page: 35
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
    Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
    Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
    Scheduling A Final Hearing

forth in the Budget on a weekly basis to the trust account of Lowenstein Sandler LLP ("Lowenstein"), proposed counsel to the Debtors, to be held in escrow (the "Professional Fee Escrow") and paid to the Case Professionals in accordance with an order approving interim compensation procedures for Case Professionals (the "Interim Professional Compensation Order"). Notwithstanding anything to the contrary in this or any other order or the DIP Credit Documents, the Professional Fee Escrow shall not be subject to the control of the DIP Agent. So long as the DIP Agent has not delivered a Termination Declaration, the Debtor shall be authorized to fund the Professional Fee Escrow in accordance with the Budget and the DIP Credit Documents. Lowenstein shall be authorized to remit payment from the Professional Fee Escrow to Case Professionals from time to time (whether or not a Termination Declaration has been delivered pursuant to the Interim Professional Compensation Order, without further Order of the Court

        (c)      *No Direct Obligation to Pay Professional Fees or Committee Expenses*. Except for funding the DIP Carve Out, as provided herein, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals or any Committee Expenses incurred in connection with the Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Case Professional (including any Committee Expenses), or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing in this Interim Order or otherwise shall be construed to increase the DIP Carve Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than the estimated fees and disbursements reflected in the Budget.

        (d)      *Payment of DIP Carve Out*. The funding of the DIP Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise

Page: 36
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing

entitled to the protections granted under this Interim Order, the DIP Credit Agreement, the

Bankruptcy Code and applicable law.

31.    <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the</u>

<u>Case Professionals DIP Carve Out</u>.  The DIP Facility, the DIP Collateral, the Cash Collateral and

the DIP Carve Out may not be used:  (a) in connection with or to finance in any way any action,

suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the

interests of any Prepetition Secured Parties, the DIP Agent or the DIP Lenders or their respective

rights and remedies under the DIP Credit Agreement, the Prepetition Credit Agreement or this

Interim Order or the Final Order, including, without limitation, for the payment of any services

rendered by the professionals retained by the Debtor or any Statutory Committee in connection

with the assertion of or joinder in any claim, counterclaim, action, proceeding, application,

motion, objection, defense or other contested matter, the purpose of which is to seek, or the result

of which would be to obtain, any order, judgment determination, declaration or similar relief, (ii)

invalidating, setting aside, avoiding or subordinating, in whole or in part, any DIP Obligations or

Prepetition Secured Obligations, (iii) for monetary, injunctive or other affirmative relief against

the DIP Agent, any DIP Lender or any Prepetition Secured Parties, or their respective collateral,

(iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or any DIP

Lender, any DIP Lender or any Prepetition Secured Parties of any rights and remedies under this

Interim Order or the Final Order, the DIP Credit Agreement, the Prepetition Credit Agreement or

applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further

order of the Court or otherwise) by the DIP Agent upon any of the DIP Collateral or by the

Prepetition Agent with respect to its Adequate Protection Liens upon any of its Prepetition

Collateral, (v) asserting that the value of the Prepetition Collateral is less than the Prepetition

Secured Obligations, or (vi) to pursue litigation against any Prepetition Secured Parties; (b) to

Page: 37
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
         Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
         Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
         Scheduling A Final Hearing

make any distribution under a plan of reorganization in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent unless otherwise ordered by this Court; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consent of the DIP Agent; (e) objecting to, contesting, or interfering with, in any way, the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in his Interim Order or the Final Order, or seeking to prevent the DIP Agent from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations remain outstanding, without the consent of the DIP Agent, in a manner inconsistent with the Budget; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (h) incurring Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business without the prior consent of the DIP Agent, except as permitted under the DIP Credit Agreement; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Agent, the DIP Lenders or any Prepetition Secured Party; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Agent, the DIP Lenders or any Prepetition Senior Secured Creditor; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Prepetition Secured Obligations, the DIP Liens or the Prepetition Secured Liens or any other rights or interests of the DIP Agent, Prepetition Agent or the Prepetition Secured Parties.

Page: 38
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

32.    Payment of Compensation.  Nothing herein shall be construed as a consent to the

allowance of any professional fees or expenses of any Case Professionals or shall affect the right

of the DIP Agent or any of the DIP Lenders to object to the allowance and payment of such fees

and expenses.  So long as no Event of Default has occurred and is continuing, the Debtor shall be

permitted to pay fees and expenses allowed and payable by order (that has not been vacated or

stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as

the same may be due and payable, and to the extent set forth in the Budget.

33.    Reservation of Certain Third Party Rights and Bar of Challenges and Claims.

(a)    The stipulations, findings, representations and releases contained in this

Interim Order or the Payoff Letter with respect to the Prepetition Secured Parties and the

Prepetition Secured Obligations shall be binding upon all parties-in-interest, any trustee

appointed in the Chapter 11 Case and any Successor Case and any Statutory Committee (each, a

"Challenge Party"), unless and solely to the extent that (i) the Debtor received from a Challenge

Party notice of a potential Challenge (defined below) during the Challenge Period (defined

below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed

Challenge.  For purposes of this paragraph 33:  (a) "Challenge" means any claim  against any of

the Prepetition Secured Parties on behalf of the Debtor or the Debtor's creditors and interest

holders, or any objecting to or challenging of the stipulations, findings or Debtor's Stipulations

set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority,

or perfection of the security interests and liens of any Prepetition Secured Party; (ii) the validity,

allowability, priority, or amount of the Prepetition Secured Obligations (including any fees

included therein); (iii) the secured status of the Prepetition Secured Obligations; or (iv) any

liability of any of the Prepetition Secured Parties with respect to anything arising from any of the

respective Prepetition Credit Agreement; and (b) the "Challenge Period" means (i) with respect

Page: 39
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

to any party-in-interest other than the Statutory Committee for unsecured creditors, the period

from the Petition Date until the date that is seventy five (75) calendar days after the entry of this

Interim Order and (ii) with respect to the Statutory Committee for unsecured creditors, the period

from the date such Statutory Committee is formed until the date that is sixty (60) calendar days

thereafter.

(b)      During the Challenge Period, a Challenge Party shall be entitled to

determine whether a basis to assert a Challenge exists.  If a Challenge Party identifies a basis to

assert a Challenge, it must notify the Debtor, the DIP Agent and the Prepetition Secured Parties

during the Challenge Period of its demand that the Debtor initiate an action or adversary

proceeding relating thereto and from the date that the Debtor, the DIP Agent and the Prepetition

Secured Parties are so notified, the Debtor shall have five (5) days to notify the Challenge Party

of whether the Debtor intends to initiate such action (or a settlement in lieu of an adversary

proceeding) and ten (10) days to initiate such action.  If the Debtor notifies such Challenge Party

that the Debtor does not intend to initiate an action, settlement, or adversary proceeding, the

Challenge Party shall have ten (10) days from the receipt of such notice to seek standing to

initiate an action or adversary proceeding.  Nothing herein shall be deemed to grant standing in

favor of any Challenge Party absent further order of this Court.  The Debtor, if timely notified of

a potential Challenge, shall retain authority to prosecute, settle or compromise such Challenge in

the exercise of its business judgment and subject to any applicable further order of court.

(c)      Upon the expiration of the Challenge Period (subject to such ten (10) day

periods described above) (the "Challenge Period Termination Date"), without the filing of a

Challenge:  (A) any and all such Challenges and objections by any party (including, without

limitation, any Statutory Committee, any Chapter 11 trustee, and/or any examiner or other estate

representative appointed in the Case, and any Chapter 7 trustee and/or examiner or other estate

Page: 40
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

representative appointed in any Successor Case), shall be deemed to be forever waived, released

and barred, (B) all matters not subject to the Challenge, and all findings, Debtor's Stipulations,

waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to

each Prepetition Secured Parties' claims, liens, and interests shall be of full force and effect and

forever binding upon the Debtor, the Debtor's bankruptcy estate and all creditors, interest

holders, and other parties in interest in the Chapter 11 Case and any Successor Case; and (C) any

and all claims or causes of action against the Debtor or the Prepetition Secured Parties relating in

any way to the Debtor or the Prepetition Credit Agreement shall be forever waived and released

by the Debtor's estate, all creditors, interest holders and other parties in interest in the Chapter 11

Case and any Successor Case.

34.     Reservation of Rights:  Notwithstanding anything to the contrary contained in this

Interim Order, in the event there is a timely and successful Challenge by any party in interest (in

accordance with paragraph 33 hereof), this Court may unwind the repayment of the Prepetition

Secured Obligations and order the repayment of such amount to the extent that such payment

resulted in the payment of any Prepetition Secured Obligations consisting of an unsecured claim

or other amount not allowable under section 502 of the Bankruptcy Code.  Notwithstanding the

foregoing, a successful challenge shall not in any way affect the validity, enforceability or

priority of the DIP Obligations or the DIP Liens.

35.     No Third Party Rights.  Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any third party, creditor, equity holder or any

direct, indirect, or incidental beneficiary.

36.     Section 506(c) Claims.  Upon entry of the Final Order, no costs or expenses of

administration which have been or may be incurred in the Chapter 11 Case or any Successor

Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral,

Page: 41
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

the Prepetition Agent, the Prepetition Secured Parties or the Prepetition Secured Liens pursuant

to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

37.    <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order, neither

the DIP Agent, the Prepetition Agent, nor the Prepetition Secured Parties shall be subject to the

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP

Collateral.    Nothing in this Interim Order shall modify the terms of any agreement solely

between the DIP Agent and the DIP Lenders with respect to any rights, priorities and obligations

set forth thereunder.

38.    <u>Section 552(b)</u>.  The DIP Agent shall be entitled to all of the rights and benefits of

section 552(b) of the Bankruptcy Code.  Subject to the entry of the Final Order, the "equities of

the case" exception under Bankruptcy Code section 552(b) shall not apply to the DIP Agent,

Prepetition Agent, or the Prepetition Secured Parties with respect to proceeds, products,

offspring or profits of any of the Prepetition Collateral.

39.    <u>Discharge Waiver</u>.    The Debtor expressly stipulates, and the Court finds and

adjudicates that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall

be discharged by the entry of an order confirming any plan of reorganization, notwithstanding

the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been

paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The

Debtor expressly stipulates, and the Court finds and adjudicates that, none of the Adequate

Protection Liens or Adequate Protection Superpriority Claims shall be discharged by the entry of

an order confirming any plan of reorganization, notwithstanding the provisions of section

1141(d) of the Bankruptcy Code, unless the Adequate Protection Superpriority Claims and

claims secured by the Adequate Protection Liens have been paid in full in cash on or before the

effective date of a confirmed plan of reorganization.  The Debtor shall not propose or support

Page: 42
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

any plan or sale of all or substantially all of the Debtor's assets or entry of any confirmation

order or sale order that is not conditioned upon the payment in full in cash, on the effective date

of such plan of all DIP Obligations, Prepetition Secured Obligations (if any), and Adequate

Protection Superpriority Claims.  The DIP Superpriority Claim and the DIP Liens, and the

Adequate Protection Superpriority Claims and Adequate Protection Liens, shall not be affected

in any manner by the entry of an order confirming a plan in the Chapter 11 Case or any

Successor Case.

40.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of

this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly:  (a) DIP Agent's or the Prepetition Secured Parties' right to seek any other or

supplemental relief in respect of the Debtor (including the right to seek additional adequate

protection, including, without limitation, in the form of reimbursement of fees and expenses of

counsel to the Prepetition Secured Parties); (b) the rights of any of the Prepetition Secured

Parties to seek the payment by the Debtor of post-petition interest or fees pursuant to section

506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Agent under the Bankruptcy

Code or under non-bankruptcy law, including, without limitation, the right to (i) request

modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal

of the Chapter 11 Case or any Successor Case, conversion of the Chapter 11 Case to a case under

chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii)

propose, subject to the provisions of section 1121 of the Bankruptcy Code or a Chapter 11 plan.

Other than as expressly set forth in this Interim Order, any other rights, claims or privileges

(whether legal, equitable or otherwise) of the DIP Agent and the DIP Lenders.

41.    No Waiver by Failure to Seek Relief.  The failure of the DIP Agent or the DIP

Lenders to seek relief or otherwise exercise its rights and remedies under this Interim Order, the

Page: 43
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing

_____

DIP Credit Agreement, or applicable law, as the case may be, shall not constitute a waiver of any

of the rights hereunder, thereunder, or otherwise of the DIP Agent or the DIP Lenders.

42.    <u>Binding Effect of Interim Order</u>.    Immediately upon entry by this Court

(notwithstanding any applicable law or rule to the contrary), the terms and provisions of this

Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the

DIP Agent, the DIP Lenders, the Prepetition Secured Parties, all other creditors of the Debtor,

any Statutory Committee or any other court appointed committee, appointed in the Case, and all

other parties in interest and their respective successors and assigns, including any trustee or other

fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Chapter

11 Case or any Successor Case.

43.    <u>No Modification of Interim Order</u>.    Until and unless the DIP Obligations have

been paid in full in cash (such payment being without prejudice to any terms or provisions

contained in the DIP Facility which survive such discharge by their terms), and all commitments

to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives the

right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written

consent of the DIP Agent (i) any modification, stay, vacatur or amendment to this Interim Order;

or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor

(now existing or hereafter arising of any kind or nature whatsoever, including, without limitation

any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the

Bankruptcy Code) in the Chapter 11 Case or any Successor Case, equal or superior to the DIP

Superpriority Claim, other than the DIP Carve Out and the Prepetition Permitted Liens (as and to

the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens

immediately prior to the Petition Date); (b) any order allowing use of Cash Collateral resulting

from DIP Collateral; and (c) any lien on any of the DIP Collateral with priority equal or superior

Page:  44
Debtor:  In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
        Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
        Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
        Scheduling A Final Hearing

_____

to the DIP Liens.  The Debtor irrevocably waives any right to seek any amendment, modification

or extension of this Interim Order without the prior written consent, as provided in the foregoing,

of the DIP Agent, and no such consent shall be implied by any other action, inaction or

acquiescence of the DIP Agent.

44.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and

conditions of the DIP Credit Agreement or this Interim Order, the provisions of this Interim

Order shall govern and control.

45.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant

hereto shall survive entry of any order which may be entered:  (a) confirming any plan of

reorganization in the Case; (b) converting the Chapter 11 Case to a case under chapter 7 of the

Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to

which this Court abstains from hearing of the Chapter 11 Case or any Successor Case.  The terms

and provisions of this Interim Order, including the claims, liens, security interests and other

protections granted to the DIP Agent and Prepetition Secured Parties pursuant to this Interim

Order and/or the DIP Credit Agreement, notwithstanding the entry of any such order, shall

continue in the Case, in any Successor Case, or following dismissal of the Chapter 11 Case or

any Successor Case, and shall maintain their priority as provided by this Interim Order until all

DIP Obligations have been paid in full and all commitments to extend credit under the DIP

Facility are terminated.  The terms and provisions concerning the indemnification of the DIP

Agent shall continue in the Chapter 11 Case and in any Successor Case, following dismissal of

the Chapter 11 Case or any Successor Case, following termination of the DIP Credit Agreement

and/or the repayment of the DIP Obligations.

46.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final

approval of the DIP Facility is scheduled for August 6, 2014, 2014 at 10:00 a.m. (ET) before the

Page: 45
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
    Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
    Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
    Scheduling A Final Hearing
_____

Honorable Novalyn L. Winfield United States Bankruptcy Judge, Courtroom 3D, at the United

States Bankruptcy Court for the District of New Jersey located at 50 Walnut Street, 3rd floor,

Newark, New Jersey 07102.

     47.   <u>Notice of Final Hearing</u>:  Within three days of the entry of this Interim Order, the

Debtor shall serve, by United States mail, first-class postage prepaid, a copy of the DIP Motion

and this Interim Order upon:  (a) the Office of the United States Trustee for the District of New

Jersey; (b) the Internal Revenue Service; (c) the twenty (20) largest unsecured creditors of the

Debtor at their last known addresses; (d) Greenberg Traurig, LLP (Attn: Alan J. Brody and

Jeffrey M. Wolf), attorneys for the DIP Agent and the Prepetition Agent; (e) any party which has

filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; (f)

counsel for any Statutory Committee; (g) Prime Business Credit, Inc., 1055 West 7th Street, Suite

2200, Los Angeles, CA 90017 attn.: Kevin Hong, Account Executive; and (h) United LC

Capital, LLC, 3530 Wilshire Blvd., Suite 695, Los Angeles, CA 90010.

     48.   <u>Objection Deadline</u>: Objections, if any, to the relief sought in the Motion shall be

in writing, shall set forth with particularity the grounds for such objections or other statement of

position, shall be filed with the clerk of the Bankruptcy Court, and personally served upon (a)

Lowenstein Sandler LLP (Attn:  Kenneth A. Rosen and Gerald C. Bender) counsel to the Debtor,

(b) the Office of the United States Trustee for the District of New Jersey; (c) Greenberg Traurig,

LLP (Attn: Alan J. Brody and Jeffrey M. Wolf), attorneys for the DIP Agent and the Prepetition

Agent; and (d) counsel to any Statutory Committee so that such objections are filed with the

Court and received by said parties on or before **4:00 p.m. Eastern Time** on **July 30, 2014** with

respect to entry of the Final Order.

Page: 46
Debtor: In re Love Culture Inc.
Case No. 14-24508 (NLW)
Caption: Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Post-Petition
Financing (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority
Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, And (6)
Scheduling A Final Hearing
_____

49.  <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately,

notwithstanding anything to the contrary proscribed by applicable law.

50.  <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce

this Interim Order according to its terms.

51.  <u>Adequate Protection Lien in Favor of PBC</u>.  PBC is hereby granted,

pursuant to sections 361 and 363 of the Bankruptcy Code, a replacement lien on the Debtor's

right, title and interest in the assets of the Debtor to the same extent and with the same

priority that PBC had in such assets prior to the Petition Date.  Nothing in this Interim

Order shall prejudice the rights of any party in interest including, but not limited to the Debtor,

the DIP Agent, and any Statutory Committee to challenge the validity, priority, enforceability,

seniority, avoidability, perfection or extent of PBC's asserted prepetition lien and/or security

interest.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

*BOS 47482053v3*

*Approved by Judge Novalyn L. Winfield July  17, 2014*

# EXHIBIT A

*Approved by Judge Novalyn L. Winfield July  17, 2014*

*Execution Copy*

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of July 17, 2014

among

**LOVE CULTURE INC.,**
as the Borrower

The Guarantors Named Herein

**SALUS CAPITAL PARTNERS, LLC**
as Administrative Agent and Collateral Agent,

and

The Lenders Party Hereto

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Article I DEFINITIONS AND ACCOUNTING TERMS ...................................................2
    1.01    Defined Terms ...........................................................................2
    1.02    Other Interpretive Provisions ..............................................37
    1.03    Accounting Terms Generally. ...............................................38
    1.04    Rounding..................................................................................38
    1.05    Times of Day...........................................................................38
    1.06    Intentionally Omitted ............................................................38

Article II THE COMMITMENTS AND CREDIT EXTENSIONS ...................................38
    2.01    Loans; Reserves. ....................................................................38
    2.02    Borrowings of Revolving Loans. ..........................................39
    2.03    Intentionally Omitted. ...........................................................40
    2.04    Prepayments...........................................................................40
    2.05    Termination or Reduction of Commitments. .......................41
    2.06    Repayment of Loans ..............................................................41
    2.07    Interest....................................................................................41
    2.08    Fees .........................................................................................42
    2.09    Computation of Interest and Fees ........................................42
    2.10    Evidence of Debt....................................................................42
    2.11    Payments Generally; Agent's Clawback. ............................43
    2.12    Sharing of Payments by Lenders .........................................44
    2.13    Settlement Amongst Lenders.................................................45
    2.14    Defaulting Lenders.................................................................46
    2.15    Release. ...................................................................................47
    2.16    Waiver of any Priming Rights; Credit Bid. .........................48

Article III TAXES, YIELD PROTECTION AND ILLEGALITY;  APPOINTMENT OF
    BORROWER ..........................................................................48
    3.01    Taxes. ......................................................................................48
    3.02    Illegality .................................................................................50
    3.03    Inability to Determine Rates .................................................51
    3.04    Increased Costs. .....................................................................51
    3.05    Mitigation Obligations; Replacement of Lenders...............52
    3.06    Survival ...................................................................................52

Article IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .......................53
    4.01    Conditions of Initial Credit Extension .................................53
    4.02    Conditions to all Credit Extensions .....................................56

Article V REPRESENTATIONS AND WARRANTIES.................................................57
    5.01    Existence, Qualification and Power ......................................57
    5.02    Authorization; No Contravention ........................................57
    5.03    Governmental Authorization; Other Consents.....................58
    5.04    Binding Effect ........................................................................58
    5.05    Reserved..................................................................................58
    5.06    Litigation................................................................................58

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Table of Contents

Page

5.07    No Default.................................................................................58
5.08    Ownership of Property; Liens..........................................................58
5.09    Environmental Compliance. ...........................................................59
5.10    Insurance .................................................................................60
5.11    Taxes ......................................................................................60
5.12    ERISA Compliance......................................................................60
5.13    Subsidiaries; Equity Interests ..........................................................61
5.14    Disclosure ................................................................................61
5.15    Compliance with Laws .................................................................62
5.16    Intellectual Property; Licenses, Etc ...................................................62
5.17    Labor Matters............................................................................62
5.18    Security Documents. .....................................................................63
5.19    Reserved...................................................................................63
5.20    Deposit Accounts.........................................................................63
5.21    Brokers....................................................................................64
5.22    Reserved...................................................................................64
5.23    Material Contracts .......................................................................64
5.24    Casualty...................................................................................64
5.25    Intentionally Omitted ...................................................................64
5.26    Personally Identifiable Information ...................................................64
5.27    Bankruptcy Matters......................................................................64

Article VI AFFIRMATIVE COVENANTS ...........................................................65
6.01    Approved Budget; Approved Budget Variance Report ...........................65
6.02    Certificates; Other Information........................................................66
6.03    Notices ....................................................................................67
6.04    Payment of Obligations.................................................................68
6.05    Preservation of Existence, Etc .........................................................68
6.06    Maintenance of Properties ..............................................................69
6.07    Maintenance of Insurance. ..............................................................69
6.08    Compliance with Laws ..................................................................70
6.09    Books and Records; Accountants. .....................................................70
6.10    Inspection Rights. ........................................................................71
6.11    Use of Proceeds...........................................................................71
6.12    Additional Loan Parties .................................................................72
6.13    Cash Management.........................................................................72
6.14    Information Regarding the Collateral. ................................................74
6.15    Physical Inventories. .....................................................................75
6.16    Environmental Laws .....................................................................75
6.17    Further Assurances........................................................................75
6.18    Compliance with Terms of Leaseholds...............................................76
6.19    Material Contracts .......................................................................76
6.20    Approved Budget.  .......................................................................77
6.21    Employee Benefit Plans.................................................................77
6.22    Reserved...................................................................................77
6.23    Sale Pleadings; Notices to Agent. .....................................................77
6.24    Bankruptcy Milestones. .................................................................78

Table of Contents

Page

6.25    Financing Orders.................................................................................78

Article VII NEGATIVE COVENANTS ...................................................................78
7.01    Liens.......................................................................................................78
7.02    Investments............................................................................................79
7.03    Indebtedness; Disqualified Stock..........................................................79
7.04    Fundamental Changes............................................................................79
7.05    Intentionally Omitted ............................................................................79
7.06    Restricted Payments ..............................................................................79
7.07    Payments and Prepayments of Subordinated Indebtedness...................79
7.08    Change in Nature of Business................................................................79
7.09    Transactions with Affiliates ..................................................................80
7.10    Burdensome Agreements .......................................................................80
7.11    Use of Proceeds.....................................................................................80
7.12    Amendment of Material Documents......................................................80
7.13    Fiscal Year .............................................................................................81
7.14    Deposit Accounts; Credit Card Processors ...........................................81
7.15    Approved Budget Variance Test............................................................81
7.16    Repayment of Indebtedness. .................................................................81
7.17    Reclamation Claims ...............................................................................81
7.18    Chapter 11 Claims..................................................................................82
7.19    Bankruptcy Actions. ..............................................................................82
7.20    Professional Fee Escrow Account.. .......................................................82

Article VIII EVENTS OF DEFAULT AND REMEDIES ........................................82
8.01    Events of Default ...................................................................................82
8.02    Remedies Upon Event of Default ..........................................................87
8.03    Application of Funds..............................................................................88

Article IX THE AGENT..........................................................................................89
9.01    Appointment and Authority ...................................................................89
9.02    Rights as a Lender..................................................................................89
9.03    Exculpatory Provisions ..........................................................................90
9.04    Reliance by Agent..................................................................................91
9.05    Delegation of Duties ..............................................................................91
9.06    Resignation of Agent .............................................................................92
9.07    Non-Reliance on Agent and Other Lenders...........................................92
9.08    Agent May File Proofs of Claim ...........................................................92
9.09    Collateral and Guaranty Matters............................................................93
9.10    Notice of Transfer..................................................................................94
9.11    Reports and Financial Statements..........................................................94
9.12    Agency for Perfection ............................................................................95
9.13    Indemnification of Agent .......................................................................95
9.14    Relation among Lenders .........................................................................95

Article X MISCELLANEOUS .................................................................................95
10.01    Amendments, Etc..................................................................................95

BOS 47489846v7

Table of Contents

Page

10.02  Notices; Effectiveness; Electronic Communications...............................97

10.03  No Waiver; Cumulative Remedies ...........................................................99

10.04  Expenses; Indemnity; Damage Waiver.....................................................99

10.05  Payments Set Aside.................................................................................100

10.06  Successors and Assigns...........................................................................101

10.07  Treatment of Certain Information; Confidentiality.................................104

10.08  Right of Setoff........................................................................................105

10.09  Interest Rate Limitation ........................................................................106

10.10  Counterparts; Integration; Effectiveness................................................106

10.11  Survival...................................................................................................106

10.12  Severability ............................................................................................107

10.13  Replacement of Lenders ........................................................................107

10.14  Governing Law; Jurisdiction; Etc. ........................................................108

10.15  Waiver of Jury Trial...............................................................................109

10.16  No Advisory or Fiduciary Responsibility ..............................................109

10.17  USA PATRIOT Act Notice ...................................................................110

10.18  Foreign Asset Control Regulations ........................................................110

10.19  Time of the Essence ...............................................................................111

10.20  Press Releases.........................................................................................111

10.21  Additional Waivers.................................................................................111

10.22  No Strict Construction ...........................................................................112

10.23  Attachments ...........................................................................................112

**SCHEDULES**

| | |
|---|---|
| 1.01 | Guarantors |
| 2.01 | Commitments and Applicable Percentages |
| 4.01(s) | Pre-Petition Amounts |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.08(b) | Real Property |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.18 | Intellectual Property Matters |
| 5.19 | Collective Bargaining Agreements |
| 5.20(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.23 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 6.22 | Post-Closing Obligations |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Revolving Loan Notice |
| B-1 | Revolving Note |
| B-2 | [Intentionally Omitted] |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | [Intentionally Omitted] |
| G | Form of DDA Notification |
| H | Form of Credit Card Notification |
| I | Cash Management Order |
| J | Interim Financing Order |
| K | Summary of Approved Budget |

*BOS 47489846v7*

*Approved by Judge Novalyn L. Winfield July 17, 2014*

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of July 17, 2014, among LOVE CULTURE INC., a California corporation (the "Borrower"), the Persons named on Schedule 1.01 hereto (collectively, the "Guarantors"), each Lender from time to time party hereto (each a "Lender" and collectively, the "Lenders"), and SALUS CAPITAL PARTNERS, LLC, as Administrative Agent and Collateral Agent for the Lenders (as further defined below, the "Agent").

On July 16, 2014 (the "Petition Date"), the Borrower commenced a case under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 1011 et seq. (the "Bankruptcy Code"), case number 14-24508 (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). The Borrower continues to operate its businesses and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrower has requested, and the Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement to make available to the Borrower a senior secured credit facility, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, in an aggregate amount not to exceed $12,000,000, the proceeds of which will be used solely in order to (a) the extent permitted in the Interim Financing Order and the Final Financing Order, to repay certain amounts outstanding under the Pre-Petition Indebtedness, (b) pay fees, costs and expenses in connection with this Agreement, including payment of Agent's reasonable attorney's fees and other out of pocket expenses, (c) pay post-petition operating expenses of the Borrower incurred in the ordinary course of business (including purchases of inventory), (d) pay costs and expenses of administration of the Chapter 11 Case, including payment of Allowed Professional Fees, and (e) pay other amounts as specified in the Approved Budget and/or operative documentation and allowed by the Bankruptcy Court, in the case of (c) through (e), in amounts and categories consistent with the Approved Budget.

The Lenders have agreed to provide a revolving loan to the Borrower pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on terms and conditions of this Agreement and in the Interim Financing Order (or the Final Financing Order when applicable) so long as (a) such postpetition credit obligations are secured by a first priority and senior security interest in and lien upon substantially all of the assets of the Borrower, whether now existing or hereafter acquired and (b) all Obligations of the Loan Parties to the Agent and Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, in each instance as more fully set forth in the Loan Documents and in the Interim Financing Order r the Final Financing Order when applicable.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

# ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfer.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, more than fifty percent (50%) of the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or more than fifty percent (50%) of the Equity Interests, of any Person, in each case in any transaction or group of related transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Administrative Agent" means Salus in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacity.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Salus in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto in such capacities.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders in writing.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the Lenders.  As of the Closing Date, the Aggregate Revolving Commitments are $12,000,000.

- 2 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Agreement" means this Debtor-In-Possession Credit Agreement.

"Allowed Professional Fees" means incurred and allowed unpaid professional fees and expenses of the Case Professionals, to the extent such fees and expenses are incurred and allowed and payable pursuant to an order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed).

"Applicable Margin" has the meaning specified in the Fee Letter.

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time, or (b) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment at such time, in each case as the context provides. If the commitment of each Lender to make Revolving Loans has been terminated pursuant to Section 2.05 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender shall be determined based on the Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraisal" means an appraisal undertaken by an independent appraiser engaged by and satisfactory to the Agent.

"Appraised Value" means with respect to Eligible Inventory (or any subset or category thereof), the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of such Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent Inventory Appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Budget" means the debtor in possession twelve (12) week budget prepared by the Borrower and furnished to the Agent on or before the Closing Date and thereafter weekly in accordance with this Agreement, as the same may be updated, modified and/or supplemented thereafter as provided in Section 6.01(d), which budget shall include a weekly cash budget, including information on a line item basis as to (x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy related expenses (including professional fees and expenses), capital expenditures, asset sales, and fees and

expenses of the Agent (including counsel therefor) and any other fees and expenses relating to the Loan Documents), and (z) a calculation of Availability.

"Approved Budget Variance Report" shall mean a weekly report provided by the Borrower to the Agent in accordance with Section 6.01(d): (i) showing by line item actual receipts for both inventory and revenues, actual disbursement amounts, cash on hand, actual professional fees (other than counsel for the Agent) and Availability as of the last day of (i) the first two (2) week period of the Approved Budget, on a cumulative basis for such two (2) week period, (ii) the first three (3) week period of the Approved Budget, on a cumulative basis for such three (3) week period, (iv) the first four (4) week period of the Approved Budget, on a cumulative basis for such four (4) week period, and (iv) thereafter on a Cumulative Four Week Period and Cumulative Period basis (each such period above, a "Testing Period"), noting therein all variances, on a line-item basis, from amounts set forth for the applicable period in the Approved Budget, and which shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower.  The calculation of any variance for purposes of determining the Borrower's compliance with Section 7.15 shall be set forth on the Approved Budget Variance Report.

"Approved Liquidator" means a nationally recognized liquidator of recognized standing approved by the Agent in its Permitted Discretion.

"Asset Sale" means the sale of all or substantially all of the Borrower's assets pursuant to an asset purchase agreement and/or agency agreement acceptable, in each case, to the Agent and approved by the Bankruptcy Court in the Asset Sale Order pursuant to Bankruptcy Code section 363.

"Asset Sale Bidding Procedures Hearing" means the hearing before the Bankruptcy Court to consider approval of the Asset Sale Procedures Order.

"Asset Sale Effective Date" means the date on which the Asset Sale is consummated after all conditions to the closing of the Asset Sale have been satisfied or waived by Agent.

"Asset Sale Hearing" means the hearing before the Bankruptcy Court to consider approval of the Asset Sale.

"Asset Sale Motion" means a motion filed in the Bankruptcy Case seeking entry of the Asset Sale Procedures Order and the Asset Sale Order by the Bankruptcy Court.

"Asset Sale Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving the Asset Sale and distribution of proceeds to the Agent.

"Asset Sale Procedures Order" means an order of the Bankruptcy Court, in a form and substance satisfactory to the Agent (a) approving the procedures for the Asset Sale, (b) approving the form of the asset purchase agreement and (c) scheduling an auction and the Asset Sale Hearing.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee, and accepted by the Agent, in substantially the form of **Exhibit D** or any other form approved by the Agent.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a) the Maximum Revolving Loan Amount;

<u>minus</u>

(b) the Total Revolver Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all post-petition obligations are being paid within fifteen (15) days after the due date thereof (or are being contested in good faith with adequate reserves established by the Borrower).

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to <u>Section 2.04</u>, and (c) the date of termination of the commitment of each Lender to make Revolving Loans pursuant to <u>Section 8.02</u>.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, including without limitation, amounts entitled to priority under Section 503(b) of the Bankruptcy Code, as determined by the Agent in its Permitted Discretion, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion (but are not limited to), reserves based on:  (i) rent for leased properties (in the case of properties located in the United States, which are located in a Landlord Lien State) for which Agent is not a party to a Collateral Access Agreement; (ii) customs, duties, and other costs to release Inventory which is being imported into the United States or another jurisdiction in which the Loan Parties conduct business; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real property, personal property, sales, claims of the PBGC and other Taxes which  in each case, may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of the Borrower; and (v) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Bankruptcy Code" has the meaning specified in the Preamble hereto.

"Bankruptcy Court" has the meaning specified in the Preamble hereto.

"Base Rate" means a variable rate of interest per annum equal to the prime rate of interest from time to time published by www.bankrate.com.  The applicable prime rate for any date not set forth therein shall be the rate set forth the immediately preceding date.  In the event that www.bankrate.com ceases to publish a prime rate or its equivalent, the term "Base Rate" shall mean a variable rate of interest per annum equal to the highest of the "prime rate", "reference rate", "base rate", or other similar rate announced from time to time by any of the three largest banks (based on combined capital and surplus) headquartered in New York, New York and published in The Wall Street Journal (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by any such bank or by the Agent or any Lender).

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"BBCN" means BBCN Bank, a wholly owned subsidiary of BBCN Bancorp, Inc., located at 3731 Wilshire Boulevard, #400, Los Angeles, California 90010.

"BBCN Note" means BBCN Term Loan upon terms acceptable to the Agent in the Agent's sole discretion.

"BBCN Term Loan" means the term loan from the BBCN to the Borrower pursuant to the terms of the BBCN Note.

"BBCN Subordination Agreement" means that certain Subordination Agreement dated as of even date herewith between BBCN and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Blocked Account" has the meaning provided in Section 6.13(a).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" has the meaning assigned to such term in the preamble of this Agreement.

BOS 47489846v7

"Borrower Materials" means any Borrowing Base information, Approved Budget, Approved Budget Variance Report, reports, financial statements and other materials delivered by the Borrower hereunder, as well as other Reports and information provided by the Agent to the Lenders.

"Borrowing" means a borrowing consisting of simultaneous Revolving Loans made by each of the Revolving Lenders pursuant to Section 2.01.

"Borrowing Base" means, at any time of calculation, an amount equal to:

      (a)      the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by the Inventory Advance Rate;

plus

      (b)      ninety percent (95%) of the Borrower's Eligible Credit Card Receivables;

minus

      (c)      the then amount of all Availability Reserves, if any;

plus

      (d)      $2,000,000.

"Borrowing Base Certificate" means a certificate substantially in the form of **Exhibit E** hereto (with such changes therein as may be required by the Agent to reflect the components of and Reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation and additional reports, as reasonably requested by the Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the Commonwealth of Massachusetts.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means, collectively, the following fees and expenses: (i) all statutory fees required to be paid to (a) the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a), and (b) to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court; (ii) reasonable fees and expenses of the United States Trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; and (iii) the aggregate amount of accrued and unpaid professional fees and expenses of the Borrower and any Statutory Committee (as defined in the Interim Financing Order), retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327, 328, or 1103(a) of the Bankruptcy Code (the "Case Professionals"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Bankruptcy Court (which order has not been reversed, vacated or stayed) ("Allowed Professional Fees") and the reimbursement of out-of-pocket expenses allowed by the Bankruptcy Court incurred by the Statutory Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) ("Committee Fees"), which amounts shall be equal to the sum of (a) $300,000 (which is being deposited into the Professional Fee Escrow Account on the Closing Date in accordance with the Budget) allocated as follows: (I) $125,000 for Lowenstein Sandler LLP, (II) $125,000 for PriceWaterhouseCoopers, and (III) $50,000 for Committee Professionals (as defined in the Interim Financing Order) and Committee Fees; and (b) the amount which shall be funded into the Professional Fee Escrow Account on Thursday of each week (or such other day of the week selected by the Borrower) pursuant to and in accordance with the Budget (the "Periodic Compensation Fees"), provided that the DIP Agent has not delivered a Termination Declaration (as defined in the Interim Financing Order). No portion of the Carve-Out, any cash collateral or proceeds of the Loans may be used in violation of this Interim Financing Order, including paragraph 33 of the Interim Financing Order. Notwithstanding anything to the contrary contained in this Interim Financing Order, (A) until the Agent has delivered a Termination Declaration, the Borrower shall be permitted to borrow under this Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated in the Approved Budget to fund the Periodic Compensation Fees as set forth under clause (b) of this paragraph, and (B) the Borrower shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, fees and expenses of Case Professionals payable under 11 U.S.C. § 330 and § 331 pursuant to Bankruptcy Court order, regardless of whether an Event of Default has occurred and is continuing at such time. Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the Agent,

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

which amounts shall be applied to the Obligations in the order proscribed in <u>Section 8.03</u> of this Agreement.

"Case Professionals" means the Borrower's and any Statutory Committee's professionals, retained by either of them by Final Financing Order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327, 328 or 1103(a) of the Bankruptcy Code.

"Cash Management Bank" means a banking institution approved by Agent in its sole discretion to provide cash management services to the Borrower.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes the Borrower to use their cash management system, substantially in the form of Exhibit I.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u>, <u>however</u>, for the purposes of this Agreement:  (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules

BOS 47489846v7

13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of fifty-one percent (51%)] or more of the Equity Interests of the Borrower  entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(b)     during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, or control over the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing fifty-one percent (51%) or more of the combined voting power of such securities; or

(d)     the Borrower fails at any time to own, directly or indirectly, one-hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents; or

(e)     a Responsible Officer as of the Closing Date shall for any reason either cease to hold such office or be actively engaged in the day-to-day management of the Borrower, unless (i) a successor with similar industry experience, reputation and expertise is appointed within six (6) months of such cessation and such successor is appointed following good faith consultation with the Agent or (ii) if such successor does not have (or Agent shall reasonably determine such successor does not have) similar industry experience, reputation or expertise,

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

such successor is appointed with the consent of the Agent (such consent not to be unreasonably withheld, conditioned or delayed) within six (6) months of such cessation.

"Chapter 11 Case" has the meaning specified in the Preamble hereto.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of real property leased by any Loan Party.

"Collateral Agent" means Salus in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacity.

"Compliance Certificate" means a certificate substantially in the form of **Exhibit C**.

"Concentration Account" has the meaning provided in Section 6.13(e).

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is contractually bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of the cost or market value of Inventory, based upon the Borrower's accounting practices known to the Agent, which practices are consistent with the calculation of "cost" in the most recent Appraisal, as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock

BOS 47489846v7

ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(c).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender, (ii) the Agent, and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all out-of-pocket expenses incurred by the Agent in connection with this Agreement, the other Loan Documents, and the Interim Financing Order and Final Financing Order, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication or financing of the credit facilities provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facilities, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof and the Interim Financing Order and Final Financing Orders (whether or not the transactions contemplated hereby or thereby shall be consummated), or (C) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement or the Loan Documents and the Bankruptcy Case, or efforts to monitor, preserve, protect, collect, or enforce the Collateral; (b) all fees and out-of-pocket

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July 17, 2014*

charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, the disbursement of funds (or the receipt of funds) to or for the account of Loan Parties (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith; and (c) upon the occurrence and continuance of an Event of Default all reasonable out-of-pocket expenses incurred by the Lenders, provided that such Lenders shall be entitled to reimbursement for no more than one counsel representing all such Lenders (absent a conflict of interest in which case the Lenders may engage and be reimbursed for additional counsel).

"Cumulative Period" means the period from the Petition Date through the most recent week ended.

"Cumulative Four Week Period" shall mean the four-week period up to and through the Sunday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Sunday of the most recent week then ended.

"Customs Broker/Carrier Agreement" means an agreement in form and substance satisfactory to the Agent among a Loan Party, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in the Fee Letter.

"Defaulting Lender" means, subject to Section 2.14(b), any Lender that (a) has failed to (i) fund all or any portion of its Revolving Loans within one (1) Business Day of the date such Revolving Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to

- 13 -

comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.14(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"Disbursement Letter" means that certain disbursement letter dated August 16, 2013, among the Borrower and the Agent.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date; provided, however, that with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if

any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock.

"Dollars" and "$" mean lawful money of the United States.

"Early Termination Fee" has the meaning specified in the Fee Letter.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than the Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

      (a)     any Credit Card Receivable which does not constitute a "payment intangible" (as defined in the UCC);

      (b)     Credit Card Receivables that have been outstanding for more than three (3) Business Days from the date of sale giving rise thereto;

      (c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which the Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

      (d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from any Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables; or

(i)     Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of the Borrower that are finished goods, merchantable and readily saleable in the ordinary course of the Borrower's business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.   Except as otherwise agreed by the Agent, in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto;

(b)     Inventory that is leased by or is on consignment to the Borrower;

(c)     In-Transit Inventory;

(d)     Inventory that is not located in the United States of America (excluding territories or possessions of the United States);

(e)     Inventory that is not located at a location that is owned or leased by the Borrower, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrower has furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in

such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

(f)     Inventory that is located: (i) in a distribution center leased by the Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(g)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete, custom items, work in process, raw materials or that constitute samples, spare parts, promotional, marketing, labels, bags, boxes and other packaging and shipping materials or supplies used or consumed in Borrower's business, (iv) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (v) are bill and hold goods;

(h)     Inventory that is not subject to a perfected first priority security interest in favor of the Agent;

(i)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(j)     Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit; or

(k)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning specified in <u>Section 8.01</u>.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in <u>Section 10.01</u> hereof.

"Excluded Taxes" means, with respect to the Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a)

BOS 47489846v7

taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) pursuant to the laws of the jurisdiction under which such recipient is organized, in which its principal office is located or, in the case of any Lender, its Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto, except, in the case of an assignee pursuant to a request by the Borrower under Section 10.13, to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to such assignment, to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (d) in the case of a Foreign Lender that designates a new Lending Office, any withholding tax that is imposed on amounts payable to such Foreign Lender with respect to the new Lending Office, except to the extent that such Foreign Lender was entitled, immediately prior to such change in Lending Office, to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (e) any U.S. federal, state or local backup withholding tax, and (f) Taxes attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), (g) any U.S. federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments related to any Acquisition.

"Facility Guaranty" means any Guarantee made by a Guarantor in favor of the Agent and the Lenders, in form and substance reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means current Section 1471 through 1474 of the Code or any amended version or successor provision that is substantively similar to and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith.

"Fee Letter" means that certain fee letter dated July 17, 2014, among the Borrower and the Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Final Financing Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent, and from which no appeal or motion to reconsider has been filed,

together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Agent's claims.

"Financial Advisor" shall mean Pricewaterhouse Coopers or such other consultant acceptable to the Agent in its Permitted Discretion.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells In-Transit Inventory to a Loan Party.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of a Loan Party purchased from such Foreign Vendor.

"Fronting Fee" has the meaning assigned to such term in Section 2.03(h).

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary (other than any CFC) that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under

conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)      indebtedness arising from Capital Lease Obligations;

(f)      all mandatory obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest (valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends); and

(g)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Fair Market Value" means with respect to the Borrower's Intellectual Property, the fair market value of such Intellectual Property, which value shall be determined from time to time by the most recent Appraisal undertaken by an independent appraiser engaged by the Agent.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Interest Payment Date" means the first day after the end of each month and the Termination Date.

"Interim Financing Order" means, collectively, an order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, together with all extension, modifications, and amendments thereto, in form and substance satisfactory to the Agent in its Permitted Discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit J.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of a Loan Party which is in the possession of a common carrier and is in transit from a Foreign Vendor of a Loan Party from a location outside of the continental United States to a location of a Loan Party that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all:  (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Advance Rate" means one hundred (100%) percent.

"Inventory Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the salability of the Eligible Inventory, which reflect factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with realization upon the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

(a)     Obsolescence;

(b)     Shrink;

(c)     Imbalance;

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

    (d)      Change in Inventory character;

    (e)      Change in Inventory composition;

    (f)      Change in Inventory mix;

    (g)      Markdowns (both permanent and point of sale);

    (i)      Retail markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

    (j)      Out of date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Investment Banker" shall mean Consensus Advisory Services LLC or such other investment banker acceptable to the Agent in its Permitted Discretion.

"IRS" means the United States Internal Revenue Service.

"Joinder" means an agreement, in form and substance satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either the Borrower or a Guarantor, as the Agent may determine.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means, individually, a Revolving Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender as such Lender may from time to time notify the Borrower and the Agent.

"LIBO Rate" means, as of any date of determination, the greater of (a) one percent (1.0)% per annum, and (b) the rate per annum for LIBOR as published by www.bankrate.com (or other commercially available source providing quotations of LIBOR as designated by the Agent from time to time) for an interest period of thirty (30) days. If such rate is not available at such time for any reason, then the "LIBO Rate" shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars in the approximate outstanding amount of the applicable Loans would be offered to major banks in the London interbank eurodollar market in which Salus participates for an interest period of thirty (30) days.

"LIBO Rate Loan" means a Loan that bears interest at a rate based on the LIBO Rate.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Borrower with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Borrower acting with the consent of the Agent, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means any extension of credit by a Lender to the Borrower under Article II in the form of a Revolving Loan.

"Loan Account" has the meaning assigned to such term in Section 2.10(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, the Disbursement Letter, all Borrowing Base Certificates, the Blocked Account

Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, each Facility Guaranty, the BBCN Subordination Agreement and any other instrument or agreement now or hereafter executed and delivered by a Loan Party in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) of the Borrower and the other Loan Parties taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party following the commencement of the Chapter 11 Case and the entry of the respective orders in connection with the first day motions filed pursuant to Section 4.01 hereof; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect.  Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case, (ii) anticipated store closings and asset sales, and (iii) events specifically stated in the Declaration of the Chief Restructuring Officer in Support of Chapter 11 Petitions and First Day Motions, dated on or about the date hereof, will not be deemed to have a Material Adverse Effect.

"Material Contract" means with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $100,000 or more or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"Maturity Date" means July 17, 2015.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Maximum Revolving Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Borrowing Base.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions or has any liability on account of an ERISA Affiliate.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket fees, costs and expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and

(b)      with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(ii).

"Note" means a Revolving Note as may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan (including payments in respect of reimbursement of disbursements and interest thereon, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to

- 27 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means with respect to Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments, occurring on such date.

"Overadvance" means a Revolving Loan or other circumstance resulting in Availability being less than zero.

"Participant" has the meaning specified in Section 10.06(d).

"Participation Register" has the meaning provided therefor in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years or to which Borrower has any liability (including contingent liability on account of any ERISA Affiliate).

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable business judgment from the perspective of a secured, asset-based commercial lender.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)     Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)      Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)      Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)      Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)      Liens existing on the Closing Date and listed on Schedule 7.01;

(h)      [reserved];

(i)      Liens in favor of the Agent;

(j)      Statutory Liens of landlords and lessors in respect of rent and the title and interest of a lessor or sublessor in and to personal property leased or subleased, in each case extending only to such personal property;

(k)      Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Permitted Investments, provided that such liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)      Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

BOS 47489846v7

Approved by Judge Novalyn L. Winfield July  17, 2014

(m)    Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party; and

(n)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are (i) being contested in good faith by appropriate proceedings, (ii) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03;

(b)    Indebtedness of any Loan Party to any other Loan Party;

(c)    [reserved];

(d)    Indebtedness in respect of letters of credit issued for the account of Borrower in an aggregate face amount not to exceed $1,000,000 (for which Borrower shall notify Lender in writing identifying the proposed letter of credit, including the applicable amount, beneficiary, issuing bank, and purpose thereof, and request a Revolving Loan the proceeds of which shall be used as cash collateral to secure the obligations of the Borrower to the applicable issuing bank);

(e)    the Obligations; and

(f)    the BBCN Term Loan.

"Permitted Investments" means:

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)    commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

BOS 47489846v7

(c) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d) Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (c) above;

(e) Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(f) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date;

(g) Investments consisting of extensions of credit in the nature of accounts receivable arising from the grant of trade credit in the ordinary course of business, Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers; and

(h) advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $100,000 to any individual at any time or in an aggregate amount not to exceed $250,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes.

"Permitted Overadvance" means an Overadvance made by the Agent, in its Permitted Discretion, which:

(a) Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b) Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(c)      Is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Revolving Loans would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.04 hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Preamble to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Prepayment Event" means:

(a)      any Disposition (other than a sale of inventory in the ordinary course of business) of any property or asset of any Loan Party;

(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), other than any such event in which the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)      the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party and (ii) as a compensatory issuance to any employee, officer, director, or consultant (including under any option plan);

(d)      the incurrence by a Loan Party of any Indebtedness for borrowed money; not permitted to be incurred under this Agreement; or

(e)      the receipt by any Loan Party of any Extraordinary Receipt.

"Pre-Petition" means occurring or arising before the Petition Date.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of August 16, 2013, among the Loan Parties, Salus Capital Partners, LLC, as agent, and the lenders party thereto, as amended prior to and in effect on the Petition Date.

BOS 47489846v7

"Pre-Petition Indebtedness" shall mean Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case under the Pre-Petition Credit Agreement and other documents, instruments and agreement executed pursuant thereto.

"Pre-Petition Permitted Liens" has the meaning specified in the Interim Financing Order.

"Professional Fee Escrow Account" means an escrow account initially in the amount of $300,000, established and maintained by the Borrower for the purpose of collecting the Carve-Out.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts and Collections" has the meaning specified in 6.13(e).

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.11(a).

"Request for Revolving Loan" means with respect to a Borrowing, a Committed Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the sum of the Aggregate Revolving Commitments or, if the Aggregate Revolving Commitments have been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings (with the aggregate amount of each Lender's risk participation being deemed "held" by such Lender for purposes of this definition); provided that the Revolving Commitment of, and the portion of the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, chief accounting officer or controller of a Loan Party or any of the other individuals designated in writing to the Agent by an existing

BOS 47489846v7

Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder and for whom the Agent has received satisfactory background checks.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any (i) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment, and (ii) any management fee or similar type fee.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Revolving Commitment" means, as to each Revolving Lender, its obligation to make Revolving Loans to the Borrower in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Revolving Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which the Revolving Lender becomes a party hereto, as applicable.

"Revolving Lender" means each Lender having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Revolving Lender.

"Revolving Note" means a promissory note made by the Borrower in favor of a Revolving Lender evidencing the Revolving Loans made by such Revolving Lender, substantially in the form of **Exhibit B-1**.

"Revolving Loan" has the meaning specified in Section 2.01(c).

"Revolving Loan Notice" means a notice of a Borrowing, pursuant to Section 2.01(c), which, if in writing, shall be substantially in the form of **Exhibit A**.

"S&P" means Standard & Poor's Ratings Services and any successor thereto.

"Salus" means Salus Capital Partners, LLC and its successors.

"Salus Entity" has the meaning provided in Section 10.06(h).

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means collectively, the Security Agreement, the Blocked Account Agreements, the Credit Card Notifications, IP Assignments, and each other security agreement or other instrument or document executed and delivered by a Loan Party to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.13(a).

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person on a particular date, that on such date (a) at fair valuation, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair saleable value of the properties and assets of such Person is not less than the amount that would be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, and (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged.   For purposes of this definition, the amount of all Guarantees on any date of determination shall be computed as the amount that, in light of all known facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.   Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings or assessments imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the date of Agent's notice in writing to the Borrower of the occurrence of an Event of Default, (ii) a sale of all or substantially all of the assets of the Borrower except as otherwise permitted herein, (iii) the confirmation of a Plan of Reorganization or Liquidation, (iv) the date all obligations under this Agreement are paid in full other than contingent indemnification obligations, or (v) the Maturity Date.

"Total Outstandings" means the Outstanding Amount of the Total Revolver Outstandings.

"Total Revolver Outstandings" means the aggregate Outstanding Amount of all Revolving Loans.

"Trading with the Enemy Act" has the meaning set forth in <u>Section 10.18</u>.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes and

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

directs the Borrower to pay certain pre-petition wages, benefits and other amounts owing to employees.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Agreement), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and any other contingent Obligations, providing cash collateralization or other collateral pursuant to the terms of this Agreement as may be otherwise requested by the Agent) of all of the Obligations other than unasserted contingent indemnification Obligations.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**1.03    Accounting Terms Generally.**

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (in the case of a ratio or requirement set forth in the Loan Documents, subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent such financial statements as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    Intentionally Omitted**.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01    Loans; Reserves.**

(a)    [Reserved.

(b)    Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "<u>Revolving Loan</u>") to the Borrower from time to time,  during the Availability Period on any Business Day on which the Agent's office is open to conduct business, subject in each case to the following limitations:

(i)    after giving effect to any Borrowing of Revolving Loans, the Total Revolver Outstandings shall not exceed the Maximum Revolving Loan Amount; and

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(ii)     after giving effect to any Borrowing of Revolving Loans, the aggregate Outstanding Amount of the Revolving Loans of any Lender shall not exceed the lesser of (A) such Lender's Revolving Commitment and (B) such Lender's Applicable Percentage of the Borrowing Base.

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(b), repay under Section 2.04, and reborrow Revolving Loans under this Section 2.01(b).

(c)     The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(b) hereof.  The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

**2.02     Borrowings of Revolving Loans.**

(a)     Each Borrowing of Revolving Loans shall be made upon the Borrower's notice to the Agent.  Each notice by the Borrower pursuant to this Section 2.02(a) must be delivered to the Agent in writing not later than 12:00 p.m. on the requested date of the requested Revolving Loan.  Each Borrowing shall be in a principal amount of $50,000 or a whole multiple of $10,000 in excess thereof.  Each Revolving Loan Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Revolving Loans to be borrowed.

(b)     Following receipt of a Request for Revolving Loan, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the requested Revolving Loans (if applicable) and each Lender shall make the amount of its Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Revolving Loan Notice.  Upon satisfaction or waiver of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Revolving Loan hereunder, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower.

(c)     The Agent, without the request of the Borrower, may advance as a Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby.  The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.04(a).  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(a) shall bear interest at the interest rate applicable to the Revolving Loans.

- 39 -

BOS 47489846v7

(d)      Each Borrowing of Revolving Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentage.  The failure of any Lender to make any Revolving Loan shall neither relieve any other Lender of its obligation to fund its Revolving Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(e)      The Agent and the Lenders shall have no obligation to make any Revolving Loan if an Overadvance would result.  The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrower and the Lenders and the Borrower and each Lender shall be bound thereby.  A Permitted Overadvance is for the account of the Borrower and shall constitute a Revolving Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.04(a).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding.  The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03      Intentionally Omitted.**

**2.04      Prepayments.**

(a)      If for any reason the Total Revolver Outstandings at any time exceed the Maximum Revolving Loan Amount as then in effect, the Borrower shall immediately prepay the Revolving Loans in an aggregate amount equal to such excess.

(b)      The Borrower shall prepay the Loans with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(c)      The Borrower shall prepay the Loans in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event.

(d)      [Reserved].

(e)      [Reserved].

(f)      Prepayments made pursuant to Sections 2.04(b) above, first, shall be applied ratably to the outstanding Revolving Loans; and second, the amount remaining, if any, after the prepayment in full of all Revolving Loans outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.  Prepayments made pursuant to Section 2.04(c) above, first, shall be applied ratably to the outstanding Revolving Loans; and second, the amount remaining, if any, after the prepayment in full of all Revolving Loans

- 40 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.

**2.05    Termination or Reduction of Commitments.**

(a)    [Reserved].

(b)    The Borrower may, upon irrevocable notice from the Borrower to the Agent, terminate the Aggregate Revolving Commitments or from time to time permanently reduce the Aggregate Revolving Commitments five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $250,000 or any whole multiple of $100,000 in excess thereof, and (iii) the Borrower shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments.

(c)    If, after giving effect to any reduction of the Aggregate Revolving Commitments exceeds the amount of the Aggregate Revolving Commitments shall be automatically reduced by the amount of such excess.

(d)    The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Aggregate Revolving Commitments under this <u>Section 2.04</u>.  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Applicable Percentage of such reduction amount.    All fees (including, without limitation, commitment fees, and Early Termination Fees) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

(e)    [Reserved].

**2.06    Repayment of Loans**.    The Borrower shall repay to the Lenders on the Termination Date the Outstanding Amount of the Revolving Loans and all other outstanding Obligations outstanding on such date.

**2.07    Interest.**

(a)    Subject to the provisions of <u>Section 2.07(b)</u> below, each Revolving Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the LIBO Rate plus the Applicable Margin; <u>provided</u>, that notwithstanding fluctuations in the LIBO Rate, the effective interest rate payable by the Borrower with respect to Revolving Loans and other Obligations pursuant to <u>Section 2.07(a)</u>.

(b)    If any amount payable under any Loan Document is not paid when due (after the expiration of any applicable grace periods), whether at stated maturity, by acceleration

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders, Agent shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.08    Fees**.  The Borrower shall pay to the Agent for its own account and to the Agent, for the ratable benefit of the Lenders (as applicable) fees in the amounts, and at the times, specified in the Fee Letter.

**2.09    Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made.  For purposes of the calculation of interest on the Loans and the Outstanding Amount, all payments made by or on account of the Borrower shall be deemed to have been applied to the Loans two (2) Business Days after receipt of such payments by the Agent (as such receipt is determined pursuant to <u>Section 2.11</u>).  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.10    Evidence of Debt.**

(a)      The Revolving Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "<u>Loan Account</u>") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Revolving Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

the Agent) a Revolving Note, which shall evidence such Lender's Revolving Loans, as applicable, in addition to such accounts or records.  Each Lender may attach schedules to its Note(s) and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note(s) and upon cancellation of such Note(s), together with such Lender's agreement to provide the Borrower with customary indemnification with respect to such lost, stolen, destroyed or mutilated Note(s), the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     Agent shall render monthly statements regarding the Loan Account to the Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Credit Parties unless, within thirty (30) days after receipt thereof by the Borrower, the Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

### 2.11    Payments Generally; Agent's Clawback.

(a)     <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 12:00 p.m. on the date specified herein.  The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received after 12:00 p.m. on the date specified herein by the Agent shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue and shall be calculated pursuant to <u>Section 2.09</u>.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     <u>Funding by Lenders; Presumption by Agent</u>.  Unless the Agent shall have received notice from a Lender prior to 12:00 noon on the date of such Borrowing that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Lender agrees to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at the interest rate applicable to Revolving

- 43 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Loans.  If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Loan Borrowing to the Agent, then the amount so paid shall constitute such Lender's Revolving Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.  A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     <u>Payments by Borrower; Presumptions by Agent</u>.  Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the interest rate applicable to Revolving Loans.  A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (c) shall be conclusive, absent manifest error.

(d)     <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Revolving Loan set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of <u>Section 4.02</u> hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     [Reserved].

(f)     <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.12     Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any Revolving Lender's receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein, then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Revolving

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

      (i)  if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

      (ii)  the provisions of this Section 2.12 shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion its Revolving Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section 2.12 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

### 2.13 Settlement Amongst Lenders.

    (a)  The amount of each Lender's Applicable Percentage of outstanding Revolving Loans shall be computed weekly (or more frequently in the Agent's Permitted Discretion) and shall be adjusted upward or downward based on all Revolving Loans and repayments of Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

    (b)  The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Applicable Percentage of all Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day.  The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Agent.  If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the interest rate applicable to the Revolving Loans plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.14    Defaulting Lenders.**

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

(ii)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Revolving Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Revolving Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Revolving Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Revolving Loans were made at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Revolving Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Revolving Loans of such Defaulting Lender until such time as all Revolving Loans are held by the Lenders pro rata in accordance with the Revolving Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that

- 46 -

are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any fee payable under the Fee Letter for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    With respect to any fee payable under the Fee Letter not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrower shall not be required to pay the remaining amount of any such fee.

(b)    Defaulting Lender Cure. If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Revolving Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Revolving Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lenders having been a Defaulting Lender.

2.15    **Release.** Each Loan Party hereby acknowledges effective upon entry of the Interim Financing Order, that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Loan Parties' liability to repay the Credit Parties as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from any Credit Party. Each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Credit Party and its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation,

*Approved by Judge Novalyn L. Winfield July 17, 2014*

those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Financing Order, the Final Financing Order and the transactions contemplated hereby or thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**2.16    Waiver of any Priming Rights; Credit Bid.**  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right or alleged right, (i) pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations (other than the Carve-Out and Pre-Petition Permitted Liens); or (ii) to propose any sale or of reorganization or liquidation which seeks to limit or eliminate the right of the Agent or Lenders to credit bid all or any portion of the Obligations.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF BORROWER**

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01(a)</u>) the Agent, the Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    <u>Payment of Other Taxes by the Borrower</u>. Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

- 48 -

(c)     <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent, each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent or a Lender, shall be conclusive absent manifest error.

(d)     <u>Evidence of Payments</u>.   As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     <u>Status of Lenders</u>.   Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be provided on or prior to the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender if requested by the Borrower or the Agent (e.g. a Form W-9), shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, any Foreign Lender shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax (e.g. a Form W-81MY) duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

(f)    <u>Treatment of Certain Refunds</u>.  If the Agent or any Lender determines, in its Permitted Discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this <u>Section 3.01</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Agent, such Lender, agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent, or such Lender in the event the Agent, or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

3.02    **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Agent, any obligation of such Lender to make or continue LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans immediately.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted. Such Base Rate Loans shall bear interest at a rate equal to the Base Rate plus an applicable margin determined by the Agent in its Permitted Discretion.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**3.03    Inability to Determine Rates**.  If the Required Lenders determine that for any reason that (a) adequate and reasonable means do not exist for determining the LIBO Rate, or (b) the LIBO Rate does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Borrower and each Lender.   Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Base Rate Loans in the amount specified therein.  Such Base Rate Loans shall bear interest at a rate equal to the Base Rate plus an applicable margin determined by the Agent in its reasonable discretion.

**3.04    Increased Costs.**

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by any Lender;

(ii)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender any other condition, cost or expense affecting this Agreement;

and the result of any of the foregoing reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender in accordance with Section 3.04(c), the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, upon the request of such Lender in accordance with Section 3.04(c), the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this <u>Section 3.04</u> and delivered to the Borrower, together with such Person's request for compensation under subsection (a) or (b) of this <u>Section 3.04</u>, shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this <u>Section 3.04</u> for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05    Mitigation Obligations; Replacement of Lenders.**

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.02</u>, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.02</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrower may replace such Lender in accordance with <u>Section 10.13</u>.

**3.06    Survival**.  All of the Borrower's obligations under this <u>Article III</u> shall survive termination of the Aggregate Revolving Commitments, the Revolving Loans and all other Obligations hereunder.

*BOS 47489846v7*

*Approved by Judge Novalyn L. Winfield July  17, 2014*

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension**.  The obligation of each Lender to make its initial Revolving Loan hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's receipt of the following, each of which shall be originals, or electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)    executed counterparts of this Agreement;

(ii)    a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)    reserved;

(vi)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02(b) have been satisfied, (B) that there has been no event or circumstance since the date of the most recent audited financial statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)    a payoff letter from the agent for the lenders under the Pre-Petition Credit Agreement reasonably satisfactory in form and substance to the Agent evidencing that the commitments of the Lenders under the Pre-Petition Credit Agreement have been or concurrently with the Closing Date is being terminated, all obligations thereunder are being paid in full other than contingent indemnification obligations, and all Liens securing obligations under the Pre-Petition Credit Agreement have been or concurrently with the Closing Date are being released;

(ix)    the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(x)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xi)    [reserved];

(xii)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Pre-petition Permitted Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xiii)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been, or concurrently with the Closing Date are, so filed, registered or recorded to the satisfaction of the Agent, (B) DDA Notifications, Credit Card Notifications and Blocked Account Agreements required pursuant to Section 6.13 hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements as required by the Agent; and

(xiv)    such other assurances, certificates, documents, consents or opinions as the Agent or its counsel reasonably may require.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July 17, 2014*

(b)      [Reserved].

(c)      The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the period no later than the end of the previous week, and executed by a Responsible Officer of the Borrower.

(d)      [Reserved].

(e)      The Agent shall have received and be satisfied with the Approved Budget and such other information (financial or otherwise) reasonably requested by the Agent.

(f)      There shall not be pending any litigation or other proceeding (other than the Chapter 11 Case), the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(g)      There shall not have occurred any default of any Material Contract of any Loan Party (other than any default that arising as a result of the filing of the Chapter 11 Case).

(h)      The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(i)      All fees and expenses required to be paid to the Agent on or before the Closing Date, including fees, charges and disbursements of counsel to the Agent to the extent incurred prior to or on the Closing Date, shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(j)      The Borrower shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent).

(k)      The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(l)      Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(m)     [Reserved].

(n)     The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order (and all pre-petition amounts set forth on Schedule 4.01(s), the payment of which has been authorized by the Wage Order, shall have been paid).

(o)     At least $300,000 of the Carve-Out shall be fully funded into the Professional Fee Escrow Account in accordance with the Interim Financing Order.

(p)     The Agent shall have received and, in its discretion, approved, the initial Approved Budget and the funding of the Loans pursuant to this Agreement shall be enough to satisfy all Obligations under to the Pre-Petition Credit Agreement.

**4.02    Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for a Revolving Loan is subject to the following conditions precedent:

(a)     The representations and warranties of each other Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all respects on and as of the date of such Revolving Loan, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01;

(b)     No Default or Event of Default shall exist, or would result from such proposed Revolving Loan or from the application of the proceeds thereof;

(c)     The Agent shall have received a Request for a Revolving Loan in accordance with the requirements hereof;

(d)     No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred;

(e)     No Overadvance shall result from such Revolving Loan; and

(f)     The Bankruptcy Court shall have entered the Interim Financing Order and, if such proposed funding date is more than 30 days after the Petition Date, the Final Financing Order, entered on notice to such parties as may be reasonably satisfactory to the Agent, which Interim Financing Order or Final Financing Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent.

Each Request for a Revolving Loan submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) (b),

BOS 47489846v7

(d), (e) and (f) have been satisfied on and as of the date of the applicable Revolving Loan. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Revolving Lenders otherwise direct the Agent to cease making Revolving Loans, the Lenders will fund their Applicable Percentage of all Revolving Loans whenever made or issued, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent; provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

To induce the Credit Parties to enter into this Agreement and to make Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**. Each Loan Party (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**. The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**5.03    Governmental Authorization; Other Consents**.    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Reserved.**

**5.06    Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in <u>Schedule 5.06</u>, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**5.07    No Default**.  No Loan Party is in default under or with respect to, or party to, any Material Contract or any Indebtedness.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08    Ownership of Property; Liens.**

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests (subject to Permitted Encumbrances) in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties (subject to Permitted Encumbrances) has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)    <u>Schedule 5.08(b)</u> sets forth (i) the address as of the Closing Date (including street address, county and state) of all real property that is owned by the Loan Parties, together with a list of the holders of any mortgage or other Lien thereon.  Each Loan Party has

*Approved by Judge Novalyn L. Winfield July  17, 2014*

good, marketable and insurable fee simple title to the real property owned by such Loan Party, free and clear of all Liens, other than Permitted Encumbrances and (ii) the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

(c)     Schedule 7.01 sets forth a complete and accurate list of all Liens (other than the Agent's Liens) on the property or assets of each Loan Party and each of its Subsidiaries, as of the Closing Date, describing the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)     Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e)     Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09     Environmental Compliance.**

(a)     No Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or, to such Loan Party's knowledge, is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c)     Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed,

*Approved by Judge Novalyn L. Winfield July  17, 2014*

either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

5.10    **Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.11    **Taxes**.  The Loan Parties and their Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

5.12    **ERISA Compliance.**

(a)    The Borrower, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

BOS 47489846v7

(b)     There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     (i)     No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13     Subsidiaries; Equity Interests**. The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents or Permitted Encumbrances. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14     Disclosure**. Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such

information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.15    Compliance with Laws**.  Each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.16    Intellectual Property; Licenses, Etc**.  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person.  Except as specifically disclosed in Schedule 5.16, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.17    Labor Matters**.  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.17, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.18**    **Security Documents.**

(a)    The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.   The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in <u>Schedule II</u> of the Security Agreement.  Upon such filings and/or the obtaining of "<u>control</u>" (as defined in the UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in <u>Schedule II</u> of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

**5.19**    **Reserved**.

**5.20**    **Deposit Accounts**.

(a)    Annexed hereto as <u>Schedule 5.20(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(b)      Annexed hereto as <u>Schedule 5.20(b)</u> is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.21      Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan  Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.22      Reserved**.

**5.23      Material Contracts**.  <u>Schedule 5.23</u> sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

**5.24      Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.25      Intentionally Omitted**.

**5.26      Personally Identifiable Information**.  The Borrower maintains a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws and a true, accurate and complete copy of the current version thereof has been provided to the Agent.

**5.27      Bankruptcy Matters.**

(a)      The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Borrower shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)      After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject only to the Carve-Out.

(c)     After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to the Carve-Out and Pre-Petition Permitted Liens.

(d)     The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to entry of the Final Financing Order) or the Final Financing Order (with respect to the period on and after entry of the Final Financing Order), as the case may be, is in full force and effect and has not been vacated.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Indebtedness, the Credit Parties shall be entitled to immediate payment of such Indebtedness and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

(f)     Proper notice for (i) the Asset Sale Motion, Asset Sale Procedures Order and the Asset Sale Order, and (ii) the hearing for the approval of Asset Sale Procedures Order and the Asset Sale Order will be given.  Borrower will give on a timely basis all notices required to be given to all parties specified in the Asset Sale Motion, Asset Sale Procedures Order and Asset Sale Order.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections **Error! Reference source not found.** and 6.03) cause each Subsidiary to:

**6.01    Approved Budget; Approved Budget Variance Report**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)     Any Borrowing by the Borrower under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to any variances permitted under this Agreement or the Interim Financing Order or the Final Financing Order, as applicable). The initial Approved Budget shall depict, on a weekly basis, cash revenues, receipts,

- 65 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

expenses and disbursements, professional fees, Availability and other information for the first 3-week period from the Closing Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Agent in its Permitted Discretion. The Approved Budget shall be updated, modified or supplemented not less than on a weekly basis (with the delivery to the Agent on or before Wednesday of each week), and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Agent in its Permitted Discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event that the Agent, on the one hand, and the Borrower, on the other hand, cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated. Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as requested by the Agent in its Permitted Discretion. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable and are satisfactory to the Agent in its Permitted Discretion.

(b)     Simultaneously with delivery by the Borrower to the Agent of each updated proposed amendment to the then applicable Approved Budget in accordance with this Section 6.01(d), commencing with the first such updated proposed amendment following the Closing Date, the Borrower shall also deliver to the Agent the current Approved Budget Variance Report. In all events, however, the Borrower shall deliver an Approved Budget Variance Report to the Agent on a weekly basis, to be delivered on Wednesday of each week.

**6.02  Certificates; Other Information**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)     on Tuesday of each fiscal week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week (provided that the Appraised Value percentage applied to the Eligible Inventory set forth in each Borrowing Base Certificate shall be the percentage set forth in the most recent appraisal obtained by the Agent pursuant to Section 6.10 hereof for the applicable month in which such Borrowing Base Certificate is delivered), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting (inclusive of inventory mix by category and/or department), accounts receivable detail documentation and any additional documentation reasonably requested by the Agent;

(b)     the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

BOS 47489846v7

(c)      promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Indebtedness of the Borrower;

(d)      promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect;

(e)      promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request; and

(f)      concurrently with the delivery thereof, copies of all monthly financial statements filed by the Borrower with the Bankruptcy Court.

**6.03    Notices**.  Promptly notify the Agent:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      of any breach or non-performance of, or any default under, a Material Contract of any Loan Party or any Subsidiary thereof;

(d)      of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)      of the occurrence of any ERISA Event;

(f)      of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)      of any change in any Loan Party's senior executive officers;

(h)      of the discharge by any Loan Party of its present accounting firm or any withdrawal or resignation by such accounting firm;

- 67 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(i)      of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or any notice of default or other material communication delivered pursuant thereto, or the application for the certification of a collective bargaining agreement;

(j)      of the filing of any Lien for unpaid Taxes against any Loan Party;

(k)      of any casualty or other damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)      of any transaction of the nature contained in Article VII hereof; and

(m)      of any failure by any Loan Party to pay rent or storage fees, as applicable, at any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first or storage fees came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets; (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc**.  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties in their reasonable discretion.

**6.06    Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to real property) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, any Lender or any other Credit Party shall be a co insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(f)    Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)    Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(h)    None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07.  Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws**.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws; and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records; Accountants.**

(a)    (i)  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    At all times retain a certified public accounting firm which is reasonably satisfactory to the Agent and shall instruct such accounting firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance,

financial condition, operating results, controls, and such other matters, within the scope of the retention of such accounting firm, as may be raised by the Agent.

**6.10    Inspection Rights.**

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and a certified public accounting firm reasonably acceptable to the Agent, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Approved Budget, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, at the expense of the Borrower, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Approved Budget and any business plan of the Borrower submitted to the Agent.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral at the expense of the Borrower, including, without limitation, the assets included in the Borrowing Base and the Intellectual Property.

**6.11    Use of Proceeds**.   Use the proceeds of the Revolving Loans to (a) to the extent permitted in the Interim Financing Order and the Final Financing Order, to repay certain the Pre-Petition Indebtedness, (b) to pay fees, costs and expenses in connection with this Agreement, including payment of Agent's reasonable attorney's fees and other out of pocket expenses, (c) to pay post-petition operating expenses of the Borrower incurred in the ordinary course of business (including purchases of inventory), (d) to pay costs and expenses of administration of the Chapter 11 Case, including payment of Allowed Professional Fees, and (e) to pay other amounts as specified in the Approved Budget, in each case to the extent permitted under applicable Law, the Approved Budget and the Loan Documents, including post-petition operating expenses set forth in the Approved Budget and other expenses arising in the Chapter 11 Case as may be approved by the Bankruptcy Court and the Agent.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**6.12    Additional Loan Parties**.   Notify the Agent at the time that any Person (x) becomes a Subsidiary and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in this clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary to be pledged may be limited to sixty-five percent (65%) of the outstanding voting Equity Interests of such Subsidiary and one hundred percent (100%) of the non-voting Equity Interests of such Subsidiary), in each case in form, content and scope reasonably satisfactory to the Agent.   In no event shall compliance with this Section 6.12 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as the Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.13    Cash Management.**

(a)    At the request of the Agent, the Loan Parties shall enter into a replacement Blocked Account Agreement for each of its deposit accounts maintained at each Blocked Account Bank (collectively, together with the Concentration Account, the "Blocked Accounts").

(b)    At the request of the Agent, the Loan Parties shall deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as **Exhibit G** which have been executed on behalf of such Loan Party and delivered to each depository institution listed on Schedule 5.20(a).

(c)    At the request of the Agent, the Loan Parties shall deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as **Exhibit H** which have been executed on behalf of such Loan Party and the applicable Credit Card Issuer or Credit Card Processor and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.20(b);

(d)    From and after the Closing Date, the Loan Parties shall ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all of the following:

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(i)      all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(ii)      all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)      all proceeds of Accounts; and

(iv)      all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(e)      Each Blocked Account Agreement shall provide for wire transfer no less frequently than every Business Day (and whether or not there are then any outstanding Obligations) to the concentration account controlled by the Agent at Wells Fargo Bank, National Association (the "Concentration Account"), of all cash receipts and collections received by each Loan Party from all sources (the "Receipts and Collections"), including, without limitation, the following:

(i)      the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank);

(ii)      all amounts required to be deposited into the Blocked Accounts pursuant to clause (c) above; and

(iii)      any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event;

provided, however, the Agent may, in its sole discretion, permit the Loan Parties to have one or more "intermediate" Blocked Account Agreements, whereby such agreements would provide, upon notice from the Agent, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) all Receipts and Collections to another Blocked Account, as opposed to the Concentration Account.

(f)      The Concentration Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less frequently than daily.  The Agent shall cause all funds on deposit in the Concentration Account to be applied to the Obligations, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.04(c) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations.  In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall

BOS 47489846v7

be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(g)    Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(h)    If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(b) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to each depository institution listed on Schedule 5.20(a).

**6.14    Information Regarding the Collateral.**

(a)    Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)    Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Borrower shall advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters

*Approved by Judge Novalyn L. Winfield July  17, 2014*

reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

### 6.15    Physical Inventories.

(a)    Cause not less than two (2) physical inventories to be undertaken, at the expense of the Loan Parties, in each fiscal year and periodic cycle counts, in each case consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent.  The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.  The Borrower, within thirty (30) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)    Permit the Agent, in its Permitted Discretion, if any Default or Event of Default exists, to cause additional physical inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

### 6.16    Environmental Laws.  (a) Conduct its operations and keep and maintain its real property in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that may be appropriate or necessary to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its real property, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

### 6.17    Further Assurances.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties.  In no event shall compliance with this Section 6.17 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real property filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d)    Upon the request of the Agent, cause any of its landlords to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds**.   Except as otherwise expressly permitted hereunder, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts**.   (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect, (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**6.20    Approved Budget**.    Conduct its business in a manner consistent with the Approved Budget most recently delivered pursuant to this Agreement and accepted by the Agent in its Permitted Discretion.

**6.21    Employee Benefit Plans.**

(a)    Maintain, and cause each ERISA Affiliate to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b)    Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)    Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) above individually or in the aggregate would not have or could not reasonably be expected to have a Material Adverse Effect.

**6.22    Reserved**.

**6.23    Sale Pleadings; Notices to Agent**.

(a)    Notwithstanding anything to the contrary contained in this Agreement, if the Borrower or any other Person shall file any (i) sale motion pursuant to Section 363 and/or 365 of the Bankruptcy Code seeking authority to sell a material portion of Borrower's assets to a "stalking horse bidder", subject to the receipt of higher and better offers, pursuant to an asset purchase agreement or similar agreement, the sale motion, stalking horse bidder, and asset purchase agreement shall, in each case, be satisfactory in form and substance to the Agent in its Permitted Discretion, or (ii) motion or series of motions seeking approval by the Bankruptcy Court of bidding procedures related to any such proposed sale, such motion shall be satisfactory in form and substance to the Agent in its Permitted Discretion and shall include a requirement that the Loan Parties and their professional advisors consult with the Agent on all material aspects of any such sale process.

(b)    To the extent the Borrower commences or seeks to commence any sale process, the Borrower shall promptly, upon any such information becoming available to the Borrower, provide the Agent copies of any informational packages provided to potential bidders in accordance with the any motions of the type described in clause (a) above, and any order approving same, draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the Agent, a status report and updated information relating to such motions and permitted store closings, and copies of any bids received from any proposed bidder for all or any portion of the Borrower's assets and any updates, modifications or supplements to such information and materials.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(c)    If an Event of Default has occurred and is continuing and the Agent has accelerated the repayment of the Obligations pursuant to Section 8.02, at the request of the Agent, the Borrower shall promptly engage an Approved Liquidator on terms and conditions acceptable to the Agent in its Permitted Discretion.

**6.24    Bankruptcy Milestones**.

(a)    Asset Sales Process.  The Borrower shall conduct a process for an Asset Sale.  In connection with the Asset Sale, the Borrower shall promptly, upon any such information becoming available to the Borrower, provide the Agent copies of any informational packages provided to potential bidders, and any draft order approving the Asset Sale, all draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the Agent, a status report and updated information relating to such motions and permitted store closings, and copies of any bids received from any proposed bidder for all or any portion of the Borrower's assets and any updates, modifications or supplements to such information and materials.

(b)    Sale and Bidding Procedures.  (i) On or before July 17, 2014, the Borrower shall file the Asset Sale Motion seeking approval of the Asset Sale Bidding Procedures Order and the sale of substantially all the assets, which motion shall be in form and substance acceptable to the Agent in its Permitted Discretion.  (ii) On or before July 24, 2014, the Bankruptcy Court shall hold the Asset Sale Bidding Procedures Hearing and enter the Asset Sale Procedures Order, which order shall be in form and substance acceptable to the Agent in its Permitted Discretion.

(c)    Winning Bidder; Sale.  The Borrower shall, in the case of an Asset Sale pursuant to an agency agreement conduct an auction and choose a winning bidder for the right to conduct Asset Sales no later than July 28, 2014.  The Bankruptcy Court must enter the Asset Sale Order no later than July 29, 2014, which order shall be in form and substance acceptable to the Agent in its Permitted Discretion with the closing of the Asset Sale to occur no later than July 30, 2014.

**6.25    Financing Orders**.  The Borrower shall comply with the Interim Financing Order and the Final Financing Order, as then in effect, in all respects.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Revolving Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances and Pre-Petition Permitted Liens.

**7.02    Investments**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell Equity Interests.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person.

**7.05    Intentionally Omitted**.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect  to any action described below or would result therefrom:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party; and

(b)    the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person.

**7.07    Payments and Prepayments of Subordinated Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Subordinated Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness.

**7.08    Change in Nature of Business**.

(a)    In the case of the Borrower, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, and (v) activities incidental to the businesses or activities described in clauses (a) through (iv) of this Section 7.08(a).

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(b)    In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.    Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Borrower to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or any of its Subsidiaries, and (f) any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Borrower) of the Borrower or any of its Subsidiaries.

**7.10    Burdensome Agreements**.    Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.    Use the proceeds of any Revolving Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement.

**7.12    Amendment of Material Documents**.    Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner adverse to the Credit Parties, or (b) any Material Contract, in each case to the extent that such amendment, modification or

BOS 47489846v7

waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

      **7.13**    **Fiscal Year**.  Change the fiscal year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

      **7.14**    **Deposit Accounts; Credit Card Processors**.  Open deposit account unless the Loan Parties shall have delivered to the Agent appropriate Blocked Account Agreements consistent with the provisions of <u>Section 6.13</u> and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in <u>Section 6.13</u> hereof.

      **7.15**    **Approved Budget Variance Test**.  Permit actual (i) disbursements (including ordinary course operating expenses, bankruptcy related expenses (including professional fees and expenses), capital expenditures, and fees and expenses of the Agent (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (ii) a calculation of Availability, and (iii) the Outstanding Amount of the Loans to vary by more than fifteen percent (15%) from the results projected for each such item in the applicable Approved Budget with respect to any Testing Period (except to the extent such actual results are more favorable).

      **7.16**    **Repayment of Indebtedness**.  Without limiting any other provision hereof, except pursuant to the Approved Budget, without the express prior written consent of the Agent and pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer or assets with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

      **7.17**    **Reclamation Claims**.  (i) Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $10,000, (ii) make any payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) make any payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, and (iv) make any payments to "critical vendors;" provided that with respect to (iii) and (iv) hereof, payments may be made in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Approved Budget, or otherwise approved by the Agent in writing.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**7.18    Chapter 11 Claims**.  Incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is pari passu with or senior to the claims of the Agent against the Loan Parties.

**7.19    Bankruptcy Actions**.  Seek, consent to, or permit to exist, without the prior written consent of the Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**7.20    Professional Fee Escrow Account**.  Until all amounts outstanding under the Pre-Petition Credit Agreement and this Agreement have been paid in full and all applicable commitments to lend have terminated, pay the fees and expenses of the estate's professionals except as set forth in the Approved Budget and except from amounts in the Professional Fee Escrow Account.

<u>**ARTICLE VIII**</u>
**EVENTS OF DEFAULT AND REMEDIES**

**8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan, or (ii) any interest on any Loan, fees or other amounts payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section **Error! Reference source not found.**</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.06</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.14</u>, <u>6.24</u> or <u>Article VII</u>; or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Documents to which it is a party; or

(c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) days; or

(d)    <u>Representations and Warranties</u>.    Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (including undrawn committed or available amounts and including

- 82 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such any Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)     Chapter 11 Case.  The occurrence of any of the following in the Chapter 11 Case:

(i)     if the Borrower, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of the Borrower's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Obligations;

(ii)     other than in connection with the payment in full or refinancing of the Obligations hereunder, the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by or on behalf of the Borrower in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code, in each case without the prior written consent of the Agent; (D) that seeks to prohibit the Agent from credit bidding on any or all of the Borrower's assets during the pendency of the Chapter 11 Case; or (E) any other action or actions materially adverse to the Agent or its rights and remedies hereunder or its interest in the Collateral;

(iii)     other than in connection with the payment in full or refinancing of the Obligations hereunder, (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Borrower or any other Person to which the Agent does not consent or otherwise agree to treatment of its claims, (B) the entry of any order terminating the Borrower's exclusive right to file a plan of reorganization, or (C) the expiration of the Borrower's exclusive right to file a plan of reorganization;

(iv)     the entry of an order in any of the Chapter 11 Case confirming a plan of reorganization that (A) is not acceptable to the Agent in its Permitted Discretion or (B) does not contain a provision for termination of the commitments of the Lenders

- 83 -

*Approved by Judge Novalyn L. Winfield July  17, 2014*

hereunder and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(v) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Financing Order, the Final Financing Order or the Cash Management Order, the Asset Sale Procedures Order, the Asset Sale Order or any other order of the Bankruptcy Court affecting this Agreement or any Loan Document, the Asset Sale, without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect;

(vi) except as set forth in the "first day" motions which have been reviewed by the Agent, the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent unless otherwise permitted under this Agreement or as requested in the "first day" motions;

(vii) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

(viii) the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrower; or the sale without the Agent's consent, of all or substantially all of the Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Aggregate Revolving Commitments;

(ix) the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or the Borrower files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(x) without the Agent's prior written consent, the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 or more, except with respect to Permitted Liens on Collateral at closed stores, or (2) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

BOS 47489846v7

(xi)    the commencement of a suit or action against either of the Agent or any other Credit Party by or on behalf of the Borrower, or its bankruptcy estate;

(xii)    the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents;

(xiii)    the failure of the Borrower to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court, which is not cured within two (2) Business Days of written notice to the Borrower of same or any larger cure period provided in this Agreement;

(xiv)    if the Borrower or any of its Subsidiaries suspends or discontinues (except in connection with anticipated asset sales) or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs the Borrower and its Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for the Borrower or any of its Subsidiaries, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the terms of this Agreement;

(xv)    (1) the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Lender may otherwise agree), grant an order extending the time period of the Borrower to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date, or, (2) if such date has been extended by order of the Bankruptcy Court, the failure of the Bankruptcy Court to, within sixty (60) days prior to such extended deadline (or such later date to which the Agent may otherwise agree), grant an order further extending the time period of the Borrower to assume or reject leases;

(xvi)    the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent;

(xvii)   absent the prior written consent of the Agent and the Lenders, the filing or approval of any proposed Asset Sale Order, or draft thereof that does not provide for repayment in full in cash of all Obligations before or at the Asset Sale Effective Date;

(xviii)  if the Borrower fails to pay in full in cash all Obligations on or before the earlier of (i) the Asset Sale Effective Date and (ii) the effective date of a plan of reorganization or liquidation in the Chapter 11 Case;

(xix)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within 24 days of the Petition Date;

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(xx)    the Borrower fails to file the Asset Sale Motion within 2 day after the Petition Date;

(xxi)    the Asset Sale Bidding Procedures Order is not entered on or before July 24, 2014;

(xxii)    an auction is not conducted for the purchase of the assets on or before July 28, 2014;

(xxiii)    the Asset Sale Order is not entered on or before July 29, 2014;

(xxiv)    the closing of the sale of all or substantially all of the Borrower's remaining assets shall not have occurred on or before July 30, 2014;

(xxv)    if any plan or reorganization or liquidation is executed, filed, delivered, or any confirmation order is entered which does not provide for repayment in full in cash of all Obligations before or upon the effective date of a plan of reorganization or liquidation in the Chapter 11 Case; or

(xxvi)    if there is a stay or injunction of the Asset Sale Order or any order confirming a plan of reorganization or liquidation in the Chapter 11 Case in effect precluding the consummation of the transactions contemplated thereby.

(g)    Reserved.

(h)    Judgments.  There is entered against any Loan Party thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000 or which would reasonably likely result in a Material Adverse Effect; or

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(j)     <u>Invalidity of Loan Documents</u>. (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any of the Collateral, with the priority required by the applicable Security Document; or

(k)     <u>Change of Control</u>.  There occurs any Change of Control; or

(l)     <u>[Reserved]</u>.

(m)     <u>Loss of Collateral</u>.   There occurs any uninsured loss to any material portion of the Collateral; or

(n)     <u>Breach of Contractual Obligation</u>.   Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract; or

(o)     <u>Indictment</u>.   The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony; or

(p)     <u>Guaranty</u>.   The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(q)     <u>Material Adverse Effect</u>.  A Material Adverse Effect shall have occurred.

**8.02     Remedies Upon Event of Default**.  Subject to the terms of the Interim Financing Order and the Final Financing Order, if any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)     declare the Revolving Commitments of each Lender to make Revolving Loans to be terminated, whereupon such Revolving Commitments and obligation shall be terminated;

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties; and

(e)    <u>Credit Bidding</u>.  The Agent or any Lender may purchase, in any public or private sale conducted under the provision of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with Applicable Law, all or any portion of the Collateral.  The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to Credit Bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds**.    After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable as set forth in the proviso to <u>Section 8.02</u>), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under <u>Article III</u>) payable to the Agent;

<u>Second</u>, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable

BOS 47489846v7

to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans and other Obligations, and fees, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations), ratably among the Credit Parties in proportion to the respective amounts described in this clause Sixth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Salus to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the

BOS 47489846v7

same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender.  Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action,

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04    Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05    Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.  The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**9.06**    **Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 10.04</u> shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07**    **Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in <u>Section 9.11</u>, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08**    **Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and

BOS 47489846v7

payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

       (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the Agent and such Credit Parties under Sections 2.08 and 10.04) allowed in such judicial proceeding; and

       (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.08 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

     **9.09**    **Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option and in its Permitted Discretion,

       (a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), and the expiration, termination or Cash Collateralization of all Letters of Credit (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 10.01;

       (b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

       (c)    to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Upon request by the Agent at any time, the Required Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.09.  In each case as specified in this Section 9.09, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

       **9.10**    **Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

       **9.11**    **Reports and Financial Statements**.  By signing this Agreement, each Lender:

       (a)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

       (b)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

       (c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

       (d)    agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of Section 10.07 hereof; and

       (e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and other Borrower Materials in connection with any Revolving Loans that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims,

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

      **9.12**    **Agency for Perfection**.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

      **9.13**    **Indemnification of Agent**.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

      **9.14**    **Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

**ARTICLE X**
**MISCELLANEOUS**

      **10.01**  **Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

      (a)    increase the Revolving Commitment of any Lender (or reinstate any Revolving Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(b)      as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written consent of such Lender;

(c)      as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)      as to any Lender, change Section 2.12 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of such Lender;

(e)      change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(f)      except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

(g)      release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender;

(h)      increase the Aggregate Revolving Commitments without the written consent of each Lender;

(i)      change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrower would be increased without the written consent of each Lender, provided that the foregoing shall not limit the Permitted Discretion of the Agent to change, establish or eliminate any Reserves;

(j)      modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written consent of each Lender; and

(k)      except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan

Documents, to any other Indebtedness or Lien, as the case may be without the written consent of each Lender;

and, provided further, that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the written consent of the Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

**10.02   Notices; Effectiveness; Electronic Communications.**

(a)   <u>Notices Generally</u>.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)   if to the Loan Parties, the Agent, to the address, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

(ii)   if to any Lender, to the address electronic mail address or telephone number specified by such Lender may from time to time notify the Borrower and the Agent.

(iii)   Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received;.  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)   <u>Electronic Communications</u>.  Notices and other communications to the Loan Parties and the Lenders hereunder may be delivered or furnished by electronic

*BOS 47489846v7*

communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its Permitted Discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Internet.  In no event shall the Agent or any of its Related Parties (each, an "Agent Party") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the internet.

(d)     Change of Address, Etc.  Each of the Loan Parties, the may change its address or telephone number for notices and other communications hereunder by notice to the Agent.  Each Lender may change its address or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices (including written Revolving Loan Notices) purportedly given by or on behalf of the Loan Parties signed by a Responsible Officer even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**10.03   No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04   Expenses; Indemnity; Damage Waiver.**

(a)    <u>Costs and Expenses</u>.  The Borrower shall pay all Credit Party Expenses.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)  Reimbursement by Lenders.  Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.11(e).

(d)  Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)  Payments.  All amounts due under this Section shall be payable on demand therefor.

(f)  Survival.  The agreements in this Section shall survive the resignation of any Agent, the assignment of any Revolving Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the other Obligations.

10.05  Payments Set Aside.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its Permitted Discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be

BOS 47489846v7

satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the interest rate applicable to the Revolving Loans. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06  Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender.   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.   Any Lender may at any time assign all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.   In the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(ii)    Proportionate Amounts.   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Revolving Commitment assigned;

(iii)    Required Consents.    No consent shall be required for any assignment except the consent of the Agent shall be required for assignments in respect of any Revolving Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption.   The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, <u>however</u>, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

BOS 47489846v7

(v)     Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of Revolving Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Revolving Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.02 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lenders having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender

BOS 47489846v7

Approved by Judge Novalyn L. Winfield July  17, 2014

hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.02 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.12 as though it were a Lender.  Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain one of its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations under any of the Loan Documents (each a "Participation Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participation Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.   The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.02 and Section 10.08).  The Participation Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.02 than the applicable Lender would have

- 103 -

been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)      Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)      Transactions by Salus Entity.    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither Salus nor any Affiliate thereof (each, a "Salus Entity") shall be required to comply with this Section 10.06 in connection with any transaction involving any other Salus Entity or any of its or their lenders or funding or financing sources, and no Salus Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Salus Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Loan, or any other Obligation to any other Salus Entity or any lender or financing or funding source of a Salus Entity or (ii) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Loan, or any other Obligation; provided, however, that Salus shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender".

**10.07  Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b)

*Approved by Judge Novalyn L. Winfield July  17, 2014*

to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "<u>Information</u>" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08   Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the

event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.14 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11   Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Revolving Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied. Further, the provisions of

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

Sections 3.01, 3.02 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Revolving Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 10.04.

**10.12   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13   Replacement of Lenders**.  If any Lender requests compensation under Section 3.02, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)   the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b)   such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)   in the case of any such assignment resulting from a claim for compensation under Section 3.02 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

(d)      such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

### 10.14   Governing Law; Jurisdiction; Etc.

(a)      GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING.

(b)      SUBMISSION TO JURISDICTION.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AND THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02 NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e) ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN OR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15  Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16  No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17  USA PATRIOT Act Notice**.    Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act of 2001 (Title III of Pub. L. 107-56) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act.  Each Loan Party is in compliance, in all material respects, with the Act.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental agent or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.  The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know you customer" and anti-money laundering rules and regulations, including the Act.

**10.18  Foreign Asset Control Regulations**.    Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or executive

*Approved by Judge Novalyn L. Winfield July  17, 2014*

order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).   Furthermore, neither the Borrower nor its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19   Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.20   Press Releases.**

(a)    Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)    Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof.  The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.21   Additional Waivers.**

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

in cash of the Obligations after the termination of the Revolving Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Revolving Commitments).

(c)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Revolving Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

**10.22  No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.23  Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.  In the event of any conflict between any of the provisions of the Interim Financing Order or the Final Financing Order, as the case may be, and the provisions of this Agreement, the provisions of the Interim Financing Order or the Final Financing Order shall prevail.

BOS 47489846v7

*Approved by Judge Novalyn L. Winfield July  17, 2014*

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER**:

LOVE CULTURE INC.,

By: _____
Name: Jai June Rhee
Title: President

**GUARANTOR**:

_____
Jai June Rhee, Individually

*Approved by Judge Novalyn L. Winfield July  17, 2014*

**SALUS CAPITAL PARTNERS, LLC**, as Administrative Agent and as Collateral Agent

By: _____
Name:
Its Authorized Signatory

By: _____
Name:
Its Authorized Signatory

*BOS 47489846v7*

**SALUS CAPITAL PARTNERS, LLC**, as a Lender

By: _____
Name:
Its Authorized Signatory

By: _____
Name:
Its Authorized Signatory

*BOS 47489846v7*

*Approved by Judge Novalyn L. Winfield July  17, 2014*

# EXHIBIT B

*Approved by Judge Novalyn L. Winfield July 17, 2014*

**Love Culture, Inc.**
**DIP Budget**
**All Figures in USD $ Actuals**

| Week<br>Week Ending<br>Actual / Projected | Stub<br>1<br>7/19<br>Projected | 2<br>7/26<br>Projected | 3<br>7/31<br>Projected | 8/1-<br>Forward | Total<br>Post<br>Petition |
|---|---|---|---|---|---|
| Credit Card Collections | 650,000 | 2,260,087 | 2,260,087 | - | 5,170,173 |
| Proceeds from GOB Store Liquidations | - | - | - | 1,815,355 | 1,815,355 |
| **Total Receipts** | **650,000** | **2,260,087** | **2,260,087** | **1,815,355** | **6,985,528** |
| | | | | | |
| *Operating Disbursements* | | | | | |
| Trade and other Vendors | 836,000 | 336,000 | 336,000 | 1,008,000 | 2,516,000 |
| Salaries and Benefits | 154,000 | 824,398 | 4,000 | 757,000 | 1,739,398 |
| Occupancy | - | - | - | 1,526,820 | 1,526,820 |
| Taxes | 6,086 | 426,598 | 240,420 | 575,660 | 1,248,764 |
| Insurance | 200,000 | - | - | 50,000 | 250,000 |
| Utilities | 147,500 | 55,000 | 55,000 | - | 257,500 |
| Other | 95,443 | 182,745 | 340,457 | 350,000 | 968,645 |
| **Total Operating Disbursements** | **1,439,029** | **1,824,742** | **975,877** | **4,267,480** | **8,507,127** |
| | | | | | |
| *Bankruptcy / Non-Operating Disbursements:* | | | | | |
| DIP Fees and Expenses | 638,151 | - | 936,332 | - | 1,574,482 |
| (1) Professional Fees | 407,000 | 365,000 | 1,349,500 | - | 2,121,500 |
| Other | - | - | - | 50,000 | 50,000 |
| **Total Bankruptcy / Non-Operating Disbursements:** | **1,045,151** | **365,000** | **2,285,832** | **50,000** | **3,745,982** |
| | | | | | |
| **Total Disbursements** | **2,484,179** | **2,189,742** | **3,261,708** | **4,317,480** | **12,253,109** |
| | | | | | |
| **Free Cash Flow** | **(1,834,179)** | **70,345** | **(1,001,622)** | **(2,502,125)** | **(5,267,581)** |
| | | | | | |
| **Revolver Balance** | **8,647,979** | **8,659,540** | **9,356,050** | **11,858,175** | |
| Borrowing Base | 9,975,246 | 9,845,869 | 9,561,524 | | |
| **Net Availability** | **1,327,266** | **1,186,329** | **205,475** | | |

(1) Professional Fees include a $300k carve-out escow payment in week 3 to cover wind-down expenses

Prepared at the request of Counsel
Preliminary Draft
Subject to Change
Subject to FRE 408

*Approved by Judge Novalyn L. Winfield July  17, 2014*